STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. FRANK
    MORANO, WALTER LAURENCE MULLINS, VINCENT
    PAUL HALPIN. FRANK X. J. MARNELL, WALTER A.
    LEWIS, EUGENE V. LEWIS AND JAMES A. LEWIS,
    PLAINTIFFS IN ERROR.

Argued February 7, 1946—Decided May 3, 1946.

For the plaintiffs in error, *Frederic M. P. Pearse* and
*Julius Lichtenstein.*

For the defendant in error, *Walter D. Van Riper,* Attorney-
General, *James R. Giuliano* and *William P. Gannon,* Deputy
Attorneys-General.

The opinion of the court was delivered by

HEHER. J.   The judgment is affirmed, for the reasons
expressed in the opinion of Mr. Justice Parker for the
Supreme Court.   But, in view of the insistence of plaintiffs

in error on the oral argument and in the brief that their fundamental rights have been invaded, we shall treat the particular points in some detail.

It is urged that the count of the indictment upon which the judgment was entered, although it charges that the accused "wilfully and unlawfully did make and take what is commonly known as a book, upon the running of horses, mares and geldings," fails to charge a crime denounced by *R. S.* 2:135–3, in that the phrase "to make and take a book" is not "so commonly understood as to be self-explanatory," and the allegation is therefore wanting, in the clarity and certainty of statement requisite to apprize the accused of the offense they are called upon to meet, and the affirmance of the judg-ment of conviction would serve to deprive them of their constitutional right of pleading former jeopardy "if indicted and tried for any of the other acts relating to betting on horse racing which are forbidden by the statute;" and that, while the proofs "indicate that some form of betting on horse races was carried on in the house in Hoboken," there is no evidence tending to establish that the "particular conduct" was "book-making as that word was understood at the time of the enactment of the statute," and thus there was error in the denial of the motions to direct a verdict of acquittal.

Certainty of description of the offense charged is a prime requisite of an indictment. This requirement that the alleged criminal act be laid in certain and identifiable form is grounded in the accused's right to such specification of the accusation as may be needful for the preparation of his defense and the interposition of a plea of *autrefois convict* or *autrefois acquit* in the event of a further prosecution for the same offense. The accused has a constitutional right "to be informed of the nature and cause of the accusation" levelled against him. State Constitution, article I, paragraph 8. It is a corollary of this principle that an offense may be charged in the words of the statute, if the statute describes it in terms that in themselves import with certainty the elements of the offense, and thus the allegation satisfies the accused's fundamental rights. The statutory language need be supplemented only where necessary to particularize and identify the offense

that would otherwise be indefinite and uncertain because of the generality of the statutory language. *Linden Park Horse Association* v. *State,* 55 *N. J. L.* 557; *State* v. *Schmid,* 57 *Id.* 625; *State* v. *Spear,* 63 *Id.* 179; *State* v. *Caporale,* 85 *Id.* 495; *State* v. *Morris,* 98 *Id.* 621; *affirmed,* 99 *Id.* 526; *Levine* v. *State,* 110 *Id.* 467; *State* v. *Tuzenew,* 15 *N. J. Mis. R.* 584; *affirmed, sub nomine State* v. *Suckow,* 120 *N. J. L.* 190; *State* v. *Lewandowski,* 121 *Id.* 612; *State* v. *Lisena,* 131 *Id.* 48.

Tested by this principle, the indictment is sufficient. The amendments of the State Constitution adopted in 1897 and 1939 (Article IV, section VII, paragraph 2) outlawed book-making, *eo nomine;* and the original enforcement act, like the present, classified as a misdemeanant one who "shall make or take what is commonly known as a book, upon the running, pacing or trotting, either within or without this state, of any horse, mare or gelding," or "shall conduct the practices commonly known as bookmaking or pool selling," or "shall keep a place to which persons may resort for engaging in any such practices \* \* \*." *Pamph. L.* 1898, *p.* 812; *Comp. Stat.* 1910, *p.* 1766, § 65; *R. S.* 1937, 2:135–3; *Pamph. L.* 1940, *p.* 862. Thus, the thing denounced as a crime is book-making as "commonly known"—*i. e.,* in common understanding; and that is the making of a "book of bets" on horse races. In Webster's New International Dictionary (2d ed.), "bookmaking" is defined as the "making of a book of bets," and "bookmaker" as one who "makes a book of bets." In the old Century Dictionary and Cyclopedia, which long antedates the constitutional amendment of 1897 and the original enforcement act, we find these definitions: "Book:" "In betting, an arrangement of bets recorded in a book; a list of bets made against a specific result in a contest of any kind; as to make a book." "Bookmaking:" "The act or practice of making a book on a race or other doubtful event." "Bookmaker:" "One who makes a book on a race or other doubtful event; a professional betting man." And in Funk & Wagnall's Practical Standard Dictionary, published in 1933, a "bookmaker" is defined as "A professional betting man, especially one connected with the turf." There is a seeming

curtailment of the primary significance of these terms which no doubt is attributable to the limitation of punitive statutory provisions here and there either to horse racing or to racing generally. "Bookmaking" is "a species of betting on races;" the "business of receiving and accepting bets or wagers on the result of races, usually after quoting odds to prospective betters and having them write out slips;" it "imports some method of recording bets." 27 *C. J.* 979; 38 *C. J. S.* 54, 56. Such is the conception of the word in the case of *New York* v. *Bennett,* 113 *Fed. Rep.* 515. It has also been defined as the recording of bets on horse races in a book. *Spies* v. *Rosenstock,* 87 *Md.* 14; 39 *Atl. Rep.* 268; *Armstrong Racing Publications* v. *Moss,* 43 *N. Y. Supp.* (2d) 171; *Hofferman* v. *Simmons,* 32 *N. Y. Supp.* (2d) 244; *Albright* v. *Karston,* 206 *Ark.* 307; 176 *S. W. Rep.* (2d) 421. But see *Murphy* v. *Board of Police, N. Y.* 11 *Abb. U. C.* 337; 63 *How. Prac.* 396, 399. See, also, 5 *Words and Phrases* (*Perm. Ed.*). The term "bookmaking" originally indicated a "collection of sheets of paper or other substances upon which entries could be made either written or printed." *People on Complaint of Lennon* v. *Camio,* 300 *N. Y. Supp.* 264; *People, ex rel. Lichtenstein* v. *Langan,* 196 *N. Y.* 260; 89 *N. E. Rep.* 921.

The essence of the point made by plaintiffs in error is that the term "bookmaking" is to receive the sense and significance accorded to it prior to the adoption of the constitutional amendment of 1897 and the original enforcement statute of 1898; that the taking of bets at "odds" given by the bookmaker is an essential element of the offense; that the indictment here makes no such allegation; and that there is no proof of "any written or printed record" that the accused, or any of them, "quoted, offered or laid odds," or "made or accepted any bets based upon any odds quoted or offered." The wagers were booked on races to be run at pari-mutuel tracks; and, while under that system "odds" are posted at the track from time to time until the race is begun, determined by the *quantum* of the bets placed on the several entries, those whose wagers were placed on the winning horse share the total stake, less a fixed percentage to the track man-

agement, in proportion to their respective contributions or wagers. *Delaware Steeplechase and Race Association* v. *Wise,* 2 *Terry* (*Del.*) 587; 27 *Atl. Rep.* (*2d*) 357. Here, the odds and the results were transmitted by radio to the accused's establishment; and they paid the bettors at the odds fixed by the pari-mutuel pay-off. It is insisted that the constitutional and statutory prohibition in this regard was designed to outlaw "a particular system of gambling" current at the time of the acceptance of the constitutional amendment of 1897, "the vice of which consisted of the taking of bets at odds carefully figured by the bookmaker so as normally to produce a profit for him, regardless of the result of the race," and that "No type of betting on horses which does not possess this vice is bookmaking."

But such is plainly not the normal signification of the term; and it did not have this special meaning either in 1897 or 1939, when the pertinent constitutional provision was amended. Then, as now, "bookmaking," in common understanding, signified the making of a book of bets—*i. e.,* the making or taking and recording or registering of bets or wagers on races and kindred contests; and the particular statutory provision has ever since denounced the making or taking of a book on horse races only. The fact that the odds to be paid by the bookmaker are fixed by the pari-mutuel pay-off after the race is run is not of determining significance. The encyclopaedias and dictionaries and the cases all indicate that the special sense ascribed to the term by the accused, invoking decisions under the New York statute, is not its common meaning. Such was not the original import of the word in New York, but in the evolution of a system of law which did not proscribe gambling in all its forms, the term was given the limited scope to reach a particular evil—*i. e.,* the mulcting of the public by the bookmaker through odds so carefully arranged and worked out as to insure him a profit regardless of the result of the race. *People, ex rel. Lichtenstein* v. *Langan, supra.* Prior to the constitutional amendment of 1939, our law against gambling was all embracive, and is now except as to wagers made at pari-mutuel race tracks; and the design of the provision against bookmaking

is, not only to punish such violators, but also to prevent violations by others, and thus to enforce the general anti-gaming policy. The reason of the law, *i. e.,* the motive which led to the making of it, is one of the most certain means of ascertaining the true sense of its terms. *Dwarris on Statutes,* 668, *et seq.*

In this view, there was a plentitude of proof to sustain the charge laid in the indictment.

But it is urged that this is not so as to James A. Lewis. He was not upon the premises when the police raid occurred; and it is said that, while he had lived in the house for twenty years, there was no proof to connect him with the "activities" in the "so-called 'wire room.' "

True, there was no evidence to sustain the comment in the opinion of the Supreme Court that beside Lewis' bed in a second-floor room, there was a table "holding a telephone directly connected with the so-called 'wire room,' " but there was nevertheless sufficient evidence to require a submission of the issue of his guilt to the jury. In addition to the documents and personal papers of Lewis found in the "wire room," including copies of income tax returns and an account book, there was $16,000 in cash in a pocket of one of his suits in a closet of his bedroom. Lewis is a brother of the co-defendants bearing the same name, and one of them, Eugene, described this money to the arresting officer as the "bankroll"—"the bets taken in on the wire room." It is argued that this admission by Eugene "cannot be considered on the question of the sufficiency of the proof" as to James. None of the defendants took the witness stand. It was open to the jury to find, in the light of all the facts and circumstances, that this was money received or held for use in the operation of a bookmaking establishment. And it is a fair inference that the possessor of this money was identified with the management of the enterprise. There is no other explanation. It is a very large sum of money for one to have on hand in cash; and it is explicable in this instance only by the nature of the business conducted upon the premises. There was no evidence offered to rebut the natural inference. And there are other

circumstances, perhaps of minor consequence in themselves, which reasonably point in the same direction.

And the accused were not entitled to a directed verdict of acquittal for failure of "proof as to which defendant, if any, made or took an alleged book." The argument is that there is no evidence that any of the defendants "made or accepted any bets as principals, or had the responsibility, as bookmakers, of paying off any bets that were made," and, "at best," they were mere aiders or abettors, and were not indicted as such; and that where, as here, a statute renders aiding, abetting or assisting in the commission of a misdemeanor a separate and distinct offense, the general rule that such aiders and abettors are indictable as principals is not applicable.

Under the common law, all who are present, aiding and abetting in a felony, are treated as principals, while in the case of misdemeanors all who aid, abet or participate are deemed principals of equal guilt; and the statute under consideration is in this regard merely declaratory of the common law. *State* v. *Woodworth*, 121 *N. J. L.* 78. The principle was given recognition by this court in *State* v. *Flynn*, 76 *N. J. L.* 473.

Judgment affirmed.

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, BODINE, DONGES, HEHER, WELLS, RAFFERTY, DILL, MC-GEEHAN, JJ. 9.

*For reversal*—None.