STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HENRY R. WITTE, DEFENDANT-APPELLANT.

Argued September 28, 1953—Decided November 23, 1953.

600

*Mr. John E. Selser* argued the cause for appellant.

*Mr. David H. Harris,* Special Deputy Attorney-General, argued the cause for the State (*Mr. Theodore D. Parsons,* Attorney-General, attorney for the State; *Mr. Albert M. Ash,* Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

HEHER, J. Defendant was convicted by a jury of non-feasance in his office as Chief of Police of the Borough of Lodi, in the County of Bergen, and he appeals from the consequent judgment.

The indictment is in nine counts, each charging the knowing and willful failure of official duty in relation to gaming on the premises and during the times therein designated, contrary to *R. S.* 2:103–1. More specifically, it is alleged that defendant failed in his "public duty of using and exercising all proper, reasonable and effective means and all lawful means within his power, and diligence for the detection, apprehension, arrest and conviction of offenders against the laws," "for preserving the public peace and insuring good order" in the borough, and for "suppressing" as disorderly houses places used for gaming, bookmaking, lotteries, and so on.

Count 8 was abandoned by the State at the opening of the trial, for misdescription of the premises. Counts 2, 3 and 4 were dismissed by Judge Leyden for failure of proof of "knowledge or notice." The jury returned a verdict of guilty of the offenses charged in counts 1, 5, 6, 7 and 9. Sentence was suspended on count 1; and on counts 5, 6, 7 and 9, defendant was given concurrent terms of imprisonment in the county jail, and fined.

Defendant's appeal to the Appellate Division of the Superior Court was certified here on our own motion.

The maintenance and operation of gaming houses as alleged in the indictment is in the main conceded. The tenor of

the argument is that there was no proof of "corrupt collaboration between the Chief of Police and the 'interests' who operated the gambling enterprises," and defendant's conviction "is based upon proofs of presently known facts as distinguished from facts then generally known or then known to the defendant."

But error is assigned on rulings made in the course of the trial, apart from those relating to the sufficiency of the evidence offered to sustain the derelictions of duty charged, to which we shall now direct our attention.

## I.

Count 1 charges that a gaming house identified as Costa's Barn on Route 6, in Lodi, was "continuously" maintained and operated from January 24, 1949 to and including March 31, 1949, and that defendant "continuously, unlawfully and, wilfully did neglect, fail and omit" to take "all proper, reasonable, effective and diligent means" and measures "within his power" as chief of police "for the detection, apprehension, arrest and conviction" of the operators of the illegal establishment. Long before the commencement of the trial, this count of the indictment was on the State's motion amended to allege the continued maintenance and operation of the particular gaming house from January 24, 1947, rather than January 24, 1949, to and including March 31, 1949; and defendant now contends that this constituted an amendment of substance in disregard of Article I, paragraph 8 of the State Constitution of 1947, interdicting the prosecution of a criminal offense of the particular class unless on the presentment or indictment of a grand jury, and the Fifth and Sixth Amendments to the Federal Constitution, securing the same and kindred civil rights in certain cases.

The principles embodied in the Fifth, Sixth and Seventh Amendments rule the Federal Government alone, and do not constitute limitations upon the states. *Fay v. People of State of New York*, 332 *U. S.* 261, 67 *S. Ct.* 1613, 91 *L. Ed.* 2043 (1947); *Brown v. State of Mississippi*, 297 *U. S.* 278, 56 *S. Ct.* 461, 80 *L. Ed.* 682 (1936); *Dimick v.*

*Schiedt,* 293 *U. S.* 474, 55 *S. Ct.* 296, 79 *L. Ed.* 603, 95 *A. L. R.* 1150 (1935); *Minneapolis & St. L. R. Co. v. Bombolis,* 241 *U. S.* 211, 36 *S. Ct.* 595, 60 *L. Ed.* 961 (1916); *Iowa Central R. Co. v. State of Iowa,* 160 *U. S.* 389, 16 *S. Ct.* 344, 40 *L. Ed.* 467 (1896).

▉▉ Where, as here, the subject matter of the indictment is a continuing offense, an amendment that merely enlarges without breaking the pleaded period of continuity, by substituting an earlier day of commencement of the nonfeasance for that laid in the indictment, relates to the form and not the substance of the charge. The offense remains the same; there is no change of identity—no substitution of offenses, nor the introduction of a new and separate and distinct offense not comprehended in the indictment returned by the grand jury. Compare *State v. Grothmann,* 13 *N. J.* 90 (1953). The principle is exemplified in *State v. Sing Lee,* 94 *N. J. L.* 266 (*E. & A.* 1920).

▉ The keeping of a disorderly house is in its very nature a continuing offense, and by the same token the knowing and willful failure of punitive action against the transgressor is a continuing offense, indictable as such. Forbearing penal and suppressive measures against a continuing breach of the criminal law is a continuing nonfeasance by the responsible law enforcement authority which is not ordinarily divisible into separate and distinct crimes, punishable as such. Where an indictment charges "one continuous offense, constituted both by a series of acts and by a duration of time," and "the time and the acts are properly proved, the offense is single and indivisible." *Commonwealth v. Robinson,* 126 *Mass.* 259 (*Sup. Jud. Ct.* 1879); *Commonwealth v. Peretz,* 212 *Mass.* 253, 98 *N. E.* 1054 (*Sup. Jud. Ct.* 1912).

The subject matter of the indictment under review concerns a course of conduct constituting nonfeasance, not specific criminal acts. Compare *State v. Friedman,* 135 *N. J. L.* 419 (*Sup. Ct.* 1947), affirmed 136 *N. J. L.* 634 (*E. & A.* 1948).

The indictment charges with a *continuando* an offense inherently continuous, an infraction of the criminal law that

has duration as distinguished from a transgression consisting of an isolated act, and likewise in nature indivisible; and an amendment that alleges the identical continuing offense begun at an earlier time than that laid in the indictment does not charge a new and different omission of duty than that presented by the grand jury. The offense laid to the accused remained the same after the amendment; the stated period of its continuance was merely extended—a purely formal modification unrelated to the substance of the charge, and therefore not a separate and distinct offense beyond the ambit of the indictment found by the grand jury. Compare *In re Snow*, 120 *U. S.* 274, 7 *S. Ct.* 556, 30 *L. Ed.* 658 (1887); *In re Nielsen*, 131 *U. S.* 176, 9 *S. Ct.* 672, 33 *L. Ed.* 118 (1889). These cases are analogous. In the former it was held that cohabiting with more than one woman within the intendment of the Federal Act of March 22, 1882 (22 *Stat. at L. p.* 30, *c.* 47, 18 *U. S. C. A., s.* 513) is a single continuous offense subject to the one indictment or prosecution for all the time prior to the indictment; in the latter the holding was that but one indictment and conviction of the crime of unlawful cohabitation, under the Act of Congress of 1882, may be had for the time preceding the return of the indictment, since it is a continuous offense and therefore a single offense until prosecuted. So here, the indictment, in its original form and as amended, charges but one continuous offense, and therefore a single offense for the whole of the stated period; the amendment simply expanded the period of continuity; it did not introduce a different offense, either by way of substitution or as an additional count.

If *State v. De Lorenzo*, 80 *N. J. L.* 500 (*Sup. Ct.* 1911), has an essentially different connotation, we cannot accept it as sound in principle. Yet we concur in the observation there made that the keeping of a disorderly house may involve fundamentally different and unrelated habitual illegal practices, laid in separate indictments "presented at different times and covering different periods," and constituting "very dissimilar offenses," a radically different situation to which

the foregoing principle has no application. See, also, in this connection, *State v. Yanetti*, 101 *N. J. L.* 85 (*E. & A.* 1925). Here, the subject matter of count 1 is a continuing culpable failure of official duty.

The amendment is one of form rather than the averment of "another or different offense," and therefore in keeping with constitutional principle as embodied in *Rule* 2:4–13, now *R. R.* 3:4–5.

■ Where time is not of the essence of the offense laid in the indictment, an amendment altering the time of its alleged commission is permissible, if within the statutory period of limitation, unless thereby a different offense would be charged. The critical inquiry is whether the amendment would charge an offense not presented by the grand jury. *State v. Grothmann*, cited *supra; State v. Friedman*, cited *supra; State v. Brown*, 103 *N. J. L.* 519 (*Sup. Ct.* 1927); *State v. Shapiro*, 89 *N. J. L.* 319 (*E. & A.* 1916); *People v. Bogdanoff*, 254 *N. Y.* 16, 171 *N. E.* 890, 69 *A. L. R.* 1378 (*Ct. App.* 1930); *Vide* 7 *A. L. R.* 1543; 68 *A. L. R.* 936.

■ And the accused has a right of appeal and corrective action, if need be, notwithstanding the suspension of sentence on the conviction under the particular count. *Rule* 1:2–3*A*, now *R. R.* 1:2–4.

## II.

But it is urged that the indictment does not "clearly charge a legal duty" nor "set up with particularity a specification of the acts demonstrating an intent to violate that duty."

The argument on this point is interspersed with the contention, in various forms, that the proofs are insufficient to sustain the allegations of the several counts of the indictment. As to the frame of the indictment, the reasoning in a word seems to be that the averment of knowledge of the particular gaming operations is but the "pleader's conclusion," unsupported by factual specification, and there is also a lack of factual data bearing upon the specific "act" or "failure of action," the identity of the operator of the

particular disorderly house "on any given day of the period described or, for that matter, the entire period," whom the accused "should have arrested," and "when the arrest should have been made," "what means within his control" the accused did "not use and employ for detecting the operation," and whether "the men of his department (were) improperly assigned to duties with regard to crimes" of other categories rather than "the detection of gambling operations." In short, it is inquired "what 'proper, reasonable and effective means within his power' is it charged he failed to diligently use in the performance of his duties?"

An indictment is likened unto the complaint in a civil cause; and it is said that it is designed to inform the accused not only as to "the name of the crime charged," but also to "set up with reasonable certainty the issues of fact to be determined," and that here the indictment "characterizes the means within the control of the Chief of Police for detection of crime as adequate without setting up the facts upon which he reaches such conclusion," "speaks of the Chief's knowledge of the existence of the disorderly houses without giving any facts to justify the conclusion," and "speaks of all lawful means within the Chief's power without alleging what lawful means he had in mind," all in disregard of federal and state constitutional guaranties.

These strictures do not take into account the essential office of an indictment for a criminal offense. At common law it is requisite that an indictment identify the criminal offense laid to the accused in certain and definite terms. The specification of the accusation is sufficient if it afford the accused the means of preparing his defense and provide the basis for the plea of *autrefois convict* or *autrefois acquit*, in the event of a further prosecution for the same offense. *Linden Park Blood Horse Association v. State*, 55 N. J. L. 557 (*E. & A.* 1893); *State v. Schmid*, 57 N. J. L. 625 (*Sup. Ct.* 1895); *State v. Spear*, 63 N. J. L. 179 (*Sup. Ct.* 1899); *State v. Allgor*, 78 N. J. L. 313 (*Sup. Ct.* 1909). This is the essence of the provision of Article I, paragraph 10 of the State's 1947 Constitution securing the fundamental

right of the accused in a criminal case "to be informed of the nature and cause of the accusation." *State v. Winne,* 12 *N. J.* 152 (1953). Such was found to be the significance of a like guaranty of the Constitution of 1844. *State v. Morano,* 134 *N. J. L.* 295 (*E. & A.* 1946).

In keeping with the constitutional precept, it is provided by rule that the indictment or accusation "shall be a written statement of the essential facts constituting the offense charged." *Rule* 2:4-11, now *R. R.* 3:4-3.

■ The indictment here satisfies these basic requirements. The elements of the offense intended to be charged are delineated in certain and identifiable form; the essence of the criminal omission of official duty is averred in definitive terms; the accused could have no doubt of the nature and cause of the accusation laid to him, and there is ample protection against double jeopardy. Counsel fails to distinguish between the elements of the offense charged and the evidence bearing upon its truth. The accused may have a bill of particulars, if needed for the preparation of his defense. *R. R.* 3:4-6, formerly *Rule* 2:4-14.

### III.

It is next insisted that the record, read as a whole, reveals a "studied effort" by the State's attorney "to promote or revitalize the hysteria which has," as a matter of common knowledge, "surrounded public officials of Bergen County during the last two years as a result of many investigations conducted and the great publicity given thereto." Counsel for the accused says in his brief: "We now know that there was 'big time gambling' by Erickson and his associates; by Doto and the so-called 'big five' and by others whose names are not so important in the public mind as a result of an hysteria producing publicity; one must read the entire record to realize that this 'hysteria' was effectively promoted or revived."

In sum, it is contended that the accused "was denied a fair and impartial trial."

In particular, it is said that the State's attorney infringed the substantial rights of the accused by calling a witness, Guarini, "one of Doto's 'big five,'" to prove that the accused's trial attorney was also the attorney for the "big five," and other witnesses whose frequent resort to the constitutional immunity against self-crimination suggested that "there surrounded the gambling activities a group of so-called 'public enemies,'" and whose answers to certain questions led to feigned surprise by the State's attorney and unfavorable insinuations. And it is shown that the State's attorney intimated by questions put to Guarini that he, Guarini, "suspended" the Costa Barn operation a month before it was made the subject of newspaper notice, as the result of a "conversation" with the accused's trial attorney at a time when he was an assistant to the Prosecutor of Bergen County: whereupon counsel moved for a mistrial.

In its nature the case made by the State involved witnesses of unsavory character, and the State's *bona fide* efforts to adduce relevant evidence from such witnesses cannot be denounced as incompatible with fair play. For instance, Guarini was called to establish his conduct of Costa's Barn as a gaming house. There was a reference to his plea to an indictment charging the keeping of a disorderly house for the purpose of refreshing his recollection as to the period of operation, in itself unexceptionable. Of this, more hereafter. And if a fair and impartial trial cannot be had in the county in which the indictment was found, the remedy is a change of venue or trial by a foreign jury. *R. R.* 3:6–2, formerly *Rule* 2:6–2.

But there was no warrant whatever for the intimation that the accused's trial attorney was also the attorney for the "big five," and the insinuation that the operator of Costa's Barn was in league with him when he was assistant to the prosecutor of the county. This was an indefensible maneuver for which no justification could be offered on the oral argument, and it is no answer to say that it came in the course of a long trial in which tempers flared.

Yet we are of the view that the danger of this deviation from the proprieties was fully remediable by a cautionary instruction to the jury to disregard the insinuative queries as utterly irrelevant; and so the motion for a mistrial was ill-advised as a drastic measure not in keeping with the requirements of justice in the particular circumstances.

There is no suggestion that, in itself, proof of such legal representation of the so-called "big five" was harmful, and the witness Guarini made a categorical denial of any such relationship or conversation, this or any other, with the accused's trial attorney when he was an assistant to the prosecutor; indeed, he was quite emphatic in saying that he did not know the accused's attorney at that time.

The accused has a constitutional right to a fair and impartial trial. As the representative of the sovereignty, the prosecuting attorney in a criminal case is under a solemn and imperative duty to abstain from conduct prejudicial to a fair trial of the crucial issue of guilt or innocence, such as would mislead or confuse the jury in the doing of essential justice in accordance with the demands of due process; but where, as here, it is abundantly clear that the impropriety did not have an evil consequence, and at all events was plainly a subject for an admonitory instruction to the jury, if the accused deemed it prejudicial, there was no ground for a mistrial.

A motion for a mistrial is addressed to the sound discretion of the court; and the denial of the motion is reviewable only for an abuse of discretion. The power is to be exercised with the greatest caution, in the furtherance of justice between the accused and the State. *Vide Logan v. United States*, 144 *U. S.* 263, 12 *S. Ct.* 617, 36 *L. Ed.* 429 (1892); *Simmons v. United States*, 142 *U. S.* 148, 12 *S. Ct.* 171, 35 *L. Ed.* 968 (1891). See, also, 86 *A. L. R.* 936. Such is our judicial policy. Unless the vice is plainly ineradicable by an instruction to the jury, a mistrial is not allowable of right. In such case the accused may not invoke the latter practice in lieu of the former. And, absent a specific request by counsel, a curative instruction is not ordi-

narily the duty of the trial judge, where a mistrial is refused. Compare *State v. Corson*, 108 *N. J. L.* 12 (*Sup. Ct.* 1931); *Stale v. Terry*, 91 *N. J. L.* 539 (*E. & A.* 1918); *State v. Hauptmann*, 115 *N. J. L.* 412 (*E. & A.* 1935). See, also, *Stale v. Lynch*, 103 *N. J. L.* 64 (*E. & A.* 1926). Of course, first principles dictate that the essentials of a fair and impartial trial inherent in due process be accorded the accused. *Vide Brown v. State of Mississippi*, cited *supra*. And to that end, notice may be taken of "plain errors affecting substantial rights of the defendant, although they were not brought to the attention of the trial court." *R. R.* 1:5–1, formerly *Rule* 1:2–19. But there was no error here calling for the application of this rule.

The accused plainly did not suffer prejudice by the interrogation offered as ground for a mistrial. The questions elicited no adverse testimony; the witness denied knowing the attorney at the time, and unequivocally repelled the suggestion of contact with him; and the State's attorney did not intimate personal knowledge *contra*. There is no sound basis for the conclusion that the jury were misled. It is fairly to be presumed that the jury had the intelligence and understanding to follow the direction of the court to be guided only by the evidence actually adduced in resolving the issues within their province. Pronounced and persistent misconduct having a probable cumulative effect upon the jury is quite another thing. Compare *Berger v. United Stales*, 295 *U. S.* 78, 55 *S. Cl.* 629, 79 *L. Ed.* 1314 (1935); *Slale v. Michalis*, 99 *N. J. L.* 31 (*Sup. Cl.* 1923).

By rule of court, error in the denial of any matter resting in discretion, or in any other ruling or order made in the course of the trial, is not cause for reversal unless it is made to appear from the entire record of the trial proceedings that the accused "thereby suffered manifest wrong or injury." And it is also provided by the same rule that no judgment given upon an indictment shall be reversed for any defect of form or for "any error" except such as shall have "prejudiced the defendant in maintaining his defense upon the merits." *R. R.* 1:5–1. Such was the principle of section 136

of the old Criminal Procedure Act, enlarging the review on strict error. 2 *Comp. Stat.* 1910, *p.* 1863, *sec.* 136; *R. S.* 1937, 2:195–16. *Vide State v. Yarrow,* 104 *N. J. L.* 512 (*E. & A.* 1928); *State v. Scott,* 104 *N. J. L.* 544 (*E. & A.* 1928); *State v. Lynch,* cited *supra; Slate v. Litlman and Weinfeld,* 86 *N. J. L.* 453 (*Sup. Ct.* 1914), affirmed 88 *N. J. L.* 392 (*E. & A.* 1915); *State v. Lang,* 75 *N. J. L.* 1 (*Sup. Ct.* 1907), affirmed *Id.,* 75 *N. J. L.* 502 (*E. & A.* 1907).

There is no rational basis for concluding that, in what was done here, the accused suffered detriment in maintaining his defense upon the merits.

## IV.

There was no contention at any stage of the trial that proof of the witness Guarini's pleas of *non vult* to the indictments severally charging that he maintained disorderly houses at Costa's Barn and Hayes' Garage would violate the rule laid down in *State v. Costa,* 11 *N. J.* 239 (1953). And there is no such insistence here. Indeed, the *Costa* case is not cited on the brief submitted by the accused.

As just said, reference was had to the indictments and the pleas to refresh the witness' recollection as to the respective periods of criminal operation. When direct inquiry was made of the witness as to whether he had pleaded to an indictment charging that he maintained a disorderly house for "dice games" at Costa's Barn "between the period of December, 1946, the first day of that month, and the first day of June, 1949," the accused's attorney objected on the ground that the question "has been asked several times and the witness has already said that if those dates are in the indictment they are wrong." The objection was overruled, and the witness replied: "I pleaded to that indictment but if those dates are in that indictment they are wrong." A further question as to whether the witness had pleaded "guilty to that indictment" met with the objection that he had "answered the question." Thereupon the witness was asked if on May 21, 1951, he pleaded *non vult* to

an indictment charging that he "operated a dice .game" between January 24, 1949 and March 31, 1949, at Costa's Barn; and he answered without objection that he had "pleaded," but he did not "know what the dates were, whatever the dates read in those indictment papers I don't know, but I did plead." The State's attorney inquired whether the fact that he entered the plea of *non vult* to the indictment on May 21, 1951 would refresh his recollection, and he said: "No, it doesn't refresh my memory. Dates I am mixed up on, Mr. Harris." He was then asked if in May 1951 he entered a plea of *non vult* to an indictment charging the operation of a "dice game" at Costa's Barn from January 24 to March 31, 1949, and this was his reply: "I remember pleading to several indictments during that time. If that is the date of the pleading then it must be right." He did not remember whether he had been given a copy of the indictment before the plea was entered. All this without objection on behalf of the accused.

The witness was then asked to identify his legal representative in that proceeding, whereupon the accused's attorney objected and moved for a mistrial on the ground that "this was a deliberate attempt on the part of the State to prejudice the rights of this defendant," and it would be necessary that he, the attorney, take the witness stand "to prove that this man never even saw the indictment." The attorney continued: "I offered his plea and he agreed to offer the plea without even knowing the dates which were set up in the indictment. * * * That does not prove any fact except that he pleaded. · That has been the thing I am arguing with your Honor about. I did this and he never saw the dates in the indictment because after he got to State's Prison he complained to me about it, sir."

The record of the foregoing proceeding was then produced, and Judge Leyden, who had received the pleas, pointed out that he had "asked whether those defendants knew what they were doing and the answer by Mr. Selser was that they did know what they were doing," whereupon Mr. Selser said, "Yes, sir, I said they knew, yes, sir."

Other questions to the same end elicited an objection "on the same grounds heretofore urged." This is typical of the witness' replies: "If that is the date mentioned in the indictment it must be so. I don't remember the dates." The witness did not "think those dates were correct," or he did not "know the dates" alleged in the indictment.

Thus, there was no contention that this evidence was inadmissible under the *Costa* case, where the defendant was himself charged with the "identical offense" laid to five other persons in an indictment to which they severally entered a plea of *non vult*. The proof of the pleas was deemed prejudicial as permitting an inference by the jury that, "as the five admitted the commission of the crime in the period charged, Costa must also be guilty of having committed it at that time."

 Here, the gaming operations made the subject of the foregoing inquiry are conceded. The accused's brief acknowledges that there were "big-time gambling" operations in Lodi during his police incumbency, "developed by evidence secured long after the time involved," and he was indicted "for his failure to detect and apprehend the operators thereof"; the insistence is, as already stated, that there "was no proof of corrupt collaboration between" him and "the 'interests' who operated the gambling enterprises," and the conviction "is based upon proofs of presently known facts as distinguished from facts then generally known or then known to the defendant." That was the issue, and Guarini's pleas to the indictments returned against him could have had no adverse bearing on the inquiry.

## V.

 There was evidence of widespread gambling in Lodi during the period covered by the indictment as amended, so much so as to suggest that it was almost a matter of common notoriety. That this condition could have existed so long without the knowledge of the chief of police would seem to be incredible; indeed, he did not take the witness stand to

repel the inference of guilty knowledge and conscious failure of primary duty that is otherwise inescapable. Certainly, it cannot be said that the evidence did not warrant a finding of guilt beyond a reasonable doubt of the charges thus leveled against him. His failure to testify proceeds on the hypothesis that the evidence, unexplained and uncontradicted, does not warrant the adverse inference, and this is plainly untenable.

■■■ And we do not read the instructions as fairly open to the criticism that the offense charged was "broadened beyond reasonable legal limits." Considered as a whole, the charge was a just presentation of the issues and the legal principles involved, eminently fair to the State and the accused.

The judgment is accordingly affirmed.

WILLIAM J. BRENNAN, JR., J. (dissenting). In *State v. Costa*, 11 *N. J.* 239 (1953); *Id.*, 20 *N. J. Super.* 28 (1952), the State attempted to prove that Costa's Barn was operated as a gaming place between January 24, 1949 and March 31, 1949, through evidence of *non vult* pleas by state witnesses to indictments alleging the operations of the Barn by them for such purposes during that period. In that case Costa was on trial upon an indictment that he operated the Barn as a gambling place between those dates. The State put the so-called "Big Five" on the stand, to have each testify that he had pleaded *non vult* to an indictment charging him with operations at that time. The State insisted that each plea was an admission evidential against Costa on the fact of operation by him in that period, even though none of the "Big Five" would admit on the stand that operations had in fact been carried on through that period and insisted that operations had ceased in August 1948. We affirmed the judgment of the Appellate Division reversing Costa's conviction. We held that the pleas of *non vult* were not evidential against Costa because not admissions by him or in any other wise binding upon him. We said that the State could properly elicit the fact of his plea from its own witness on oral examination or alternatively by proof of the judgment

record only if the evidence was offered for the limited purpose of affecting the credibility of the witness, *N. J. S.* 2A:81–12, in respect of other relevant and material testimony which might be obtained from the witness by the State. We were careful to point out the danger of prejudice to the accused on trial except as the limited office of the evidence was made clear to the jury, and laid down the principle that

"It is incumbent upon the trial judge closely to supervise the introduction of the proofs of the witness's conviction for the offense and carefully to instruct the jury, not necessarily only in his charge but perhaps also when the proofs are admitted, as to the limited office to be served by the evidence in their [the jurors'] consideration of it."

The instant case was tried after reversal of Costa's conviction by the Appellate Division and pending the appeal to this court. The only difference I can see between the State's tactics in this trial and the tactics employed upon Costa's trial is that where in *Costa* the evidence was frankly offered to establish operation in the period, here, balked by the decision in *Costa*, the State resorted to a deliberate and carefully conceived plan of interrogation of Guarini to achieve that result as regards the jury under cover of protestations that the effort was designed solely to affect Guarini's credibility. What we struck down in *Costa* as improper, when the State openly disclosed its intention, we are here sanctioning, although the end was patently effected through calculated design to circumvent the limitations laid down for this form of inquiry. The State hammered at Guarini over three days to force him to admit that his plea was to an indictment covering the period in question. If Guarini's credibility was actually the target, many hours, indeed days, could have been saved and the great part of the 144 pages of Guarini's printed testimony would have been unnecessary, if, faced with Guarini's disclaimer, the State had utilized the alternative device of putting Guarini's judgment record in evidence. *State v. Duelks,* 97 *N. J. L.* 43 (*Sup. Ct.* 1922); *State v. Silver,* 101 *N. J. L.* 232 (*E. & A.* 1925), affirming 2 *N. J. Misc.* 479 (*Sup. Ct.* 1924); *State v. Costa, supra.*

It is significant that that record was marked for identification immediately after Guarini took the stand on the first day and answered the question whether he had pleaded to an indictment charging operation within the crucial period with the response that operation at Costa's Barn ceased in August 1948. Yet the State neither then nor at any time offered the record in evidence. Witte's counsel repeatedly objected that the dogged and prolonged interrogation which followed could only be designed to prejudice the accused, but the trial judge permitted the Deputy Attorney-General to persist, indeed even after receiving the obviously equivocal answer, "Not necessarily for that purpose, no sir," when the court asked if the purpose of the examination was to have the jury infer that Costa's Barn was operated during the period charged.

The majority opinion says:

"There was no contention at any stage of the trial that proof of the witness Guarini's pleas of *non vult* to the indictments severally charging that he maintained disorderly houses at Costa's Barn and Hayes' Garage would violate the rule laid down in *State v. Costa*, 11 *N. J.* 239 (1953). And there is no such insistence here. Indeed, the *Costa* case is not cited on the briefs submitted by the accused."

But the record shows that the very first time Guarini was asked to acknowledge that the indictment to which he had pleaded charged operation of Costa's Barn "from January 24, 1949, until March 31, 1949," this very shortly after he came to the stand, counsel promptly objected on the ground that "If it be the purpose of the State to prove operation the pleas to an indictment are not proof of this fact. The State has gone as far is it dare go in the examination of its witness on the basis of credibility of a witness it calls and I object to any further questions and particularly to this question on the grounds which I have urged." True, counsel did not repeat these reasons in connection with subsequent objections except to incorporate them, as the majority notes, in the statement "on the same grounds heretofore urged," but what more could be asked of him? In any

event, some three weeks later, when all the proofs were in and before the case was submitted to the jury, the accused's counsel moved "to strike from the record all testimony taken from Anthony Guarini as to his plea of *non vult* or otherwise to certain indictments charging Costa's Barn operation for specific periods of time and all testimony which relates to the period of time covered by any charge to which pleas were offered, on the ground that they were totally incompetent in this issue as proof of any fact with regard to time whatsoever," that "anything Guarini may have done is proof against him, but not proof as against Chief Witte." In this court the defendant's brief argues that "by these rulings in the admission of evidence and the rulings on the motions to strike the evidence * * * we sincerely believe that harmful error was committed in allowing this 'evidence' to remain in the record and come before the jury"; the "evidence" referred to being specified as "the testimony of Anthony Guarini, in and by which operation of Costa's Barn and Hayes' Garage for the period between January and March 1949 was to have been established by showing a plea by Guarini to an indictment charging such operation for the period of time referred to and the whole approach to a development of the fact that the attorney for the defendant Witte was the attorney for the so-called 'Big Five,' who had represented these defendants at the time of entering the plea, including that testimony which attempted to revive in the memory of the jurors the publication appearing in newspapers associated with the names 'Adonis,' 'Lynch,' 'Longano' and 'Moretti.' "

I must most respectfully disagree with my colleagues' conclusion that "Thus, there was no contention that this evidence was inadmissible under the *Costa* case." If the decision is not actually cited to us on the brief, the accused's counsel plainly invokes the principles therein on his brief, as he did, and sufficiently to require our determination of the issue, at the trial.

Next, the majority says that the purpose of the Deputy Attorney-General in his interrogation of Guarini was simply

"to refresh his [Guarini's] recollection as to the period of operation." Even the Deputy Attorney-General did not claim that that was his purpose. To the extent that he was willing to state any purpose, his insistence was that he was merely pursuing matter affecting Guarini's credibility. And I have never known counsel to attempt to have his own witness refresh his recollection as to the contents of a record without offering the witness the record for examination. But here the Deputy Attorney-General took great care not to let Guarini see the judgment record. His tactics were time after time to ask the question whether it was not the fact that the indictment Guarini had pleaded to charged him with operations at Costa's Barn from January 24, 1949 to March 31, 1949—indeed, to press for answers to other like questions even after Guarini answered to one of them that such must be the case if that was the way the indictment read.

Finally, it is said, "Guarini's pleas to the indictments returned against him would have had no adverse bearing on the inquiry." Even if I did not have a contrary view, and I do because to me the record shows an utter failure to keep the interrogation of Guarini within permissible bounds, the prejudice to the accused of this action coupled with other actions of the Deputy Attorney-General, particularly noticed by the majority and by them denominated "an indefensible maneuver," clearly demands a reversal at our hands. The Deputy Attorney-General was allowed over objection to elicit the wholly irrelevant fact that Witte's trial counsel was Guarini's attorney when Guarini pleaded, and then, totally indefensible on any ground and also over objection, was allowed to question Guarini whether Guarini's asserted closing down of operations at Costa's Barn a month before August 1948 followed a conversation with "one of the assistant prosecutors," and upon Guarini's answering that he never knew any prosecutors to ask Guarini whether he did not know that Witte's counsel was an assistant prosecutor at that time. The entire court subscribes to the observation of the majority that "there was no warrant whatever for

intimating that the accused's trial attorney was also the attorney for the 'big five,' and the insinuation that the operator of Costa's Barn was in league with [his then counsel] when he was assistant to the prosecutor of the county." Where I part with the majority is in their conclusion that "It is abundantly clear that the impropriety did not have an evil consequence." How possibly can this be true of matter necessarily suggestive to jurors' minds of the notion that the defendant and his counsel had long been parties to a corrupt conspiracy with notorious lawbreakers? This insidious seed, sown at that early stage of the trial (which continued for almost three weeks longer), had a monstrous capacity for flowering into full-blown prejudice against the defendant, not only as to the Costa count but upon all of the counts of the indictment. True, there is abundant evidence in this case of widespread gambling in Lodi of which defendant knew and which he did nothing to suppress as it was his duty to do. But, however strongly the evidence points to his guilt, society's interest is not alone that he shall not escape punishment but equally that his conviction shall be had upon a fair prosecution and a fair trial. Once that barrier to state tyranny is breached all individual liberties are at hazard.

The majority says that "The motion for mistrial was ill-advised as a drastic measure not in keeping with the requirements of justice in the particular circumstances," and that at best "the danger of this deviation from the proprieties was fully remediable by a cautionary instruction to the jury to disregard the insinuative queries as utterly irrelevant." But I nowhere find that the trial judge in any wise whatever admonished either the Deputy Attorney-General or the jury. Upon counsel's motion for mistrial the trial judge merely said, "I will deny your motion. You may note your objection." Certainly it cannot be suggested that the responsibility of this court and of the trial judge to deal with such a gross deviation from ethical standards of prosecution shall depend upon whether the accused's counsel adopts one rather than another form of objection. We in this State have

abandoned, I had hoped forever, the notion that a trial is a mere game in which justice is secondary to forms and rules. If counsel had made no objection at all, upon the plainest principles of justice and fairness, the circumstances here exhibited would cry out for remedial action by us of our own motion. This case, to me, is of the type we had in mind when, in *State v. Bogen*, 13 *N. J.* 137 (1953), we unanimously adopted what was said by Chief Justice Stone in *New York Cent. R. Co. v. Johnson*, 279 *U. S.* 310, 318, 49 *S. Ct.* 300, 303, 73 *L. Ed.* 706, 710 (1929):

> "\* \* \* The state, whose interest it is the duty of court and counsel alike to uphold, is concerned that every litigation be fairly and impartially conducted and that verdicts of juries be rendered only on the issues made by the pleadings and the evidence. The public interest requires that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict, uninfluenced by the appeals of counsel to passion or prejudice. \* \* \* Where such paramount considerations are involved, the failure of counsel to particularize an exception will not preclude this court from correcting the error."

I would reverse and remand for a new trial.

OLIPHANT and WACHENFELD, JJ., concur in this dissent.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, BURLING and JACOBS—4.

*For reversal*—Justices OLIPHANT, WACHENFELD and BRENNAN—3.