## COURT OF APPEALS.

### Nov. 9, 1909.

# THE PEOPLE EX REL. LICHTENSTEIN v. JOSEPH LANGAN.

### (196 N. Y. 260.)

(1). BOOKMAKING—MUST BE BY WRITTEN LISTS. ETC.

The vice of bookmaking chiefly consists in soliciting and in the in-- ducing the public to take chances in the carefully figured and planned scheme of the bookmaker, and this, in order to be profitable to him, requires the writing out of the list of the odds laid on some paper or material so that they could be seen by those who were solicited to invest.

(2). SAME—INFORMATION FAILING TO ALLEGE ACTS CONSTITUTING BOOK-MAKING.

An information charged the person arrested thereon with laying odds and publishing the same, but was not intended to, and did not, charge that such laying odds and publishing was by any writing or printed instrument, but that it was oral. *Held*, that such information did not allege acts which constitute the crime of bookmaking within the meaning of section 351 of the Penal Code (section 986, Penal Law, Consolidated Statutes), which provides that any person who engages in bookmaking is guilty of a misdemeanor and prescribes the penalty therefor.

People ex rel. Lichtenstein v. Langan, 132 App. Div. 937, affirmed.

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered May 7, 1909, which affirmed an order of Special Term sustaining a writ of habeas corpus and directing that the relator be released from custody.

The facts, so far as material, are stated in the opinion of HAIGHT, J.

*John F. Clarke, District Attorney* (*Robert H. Elder* of counsel), for appellant. Bookmaking is really the arrangement of

odds by which the bettor who arranges the odds seeks to do so in such a way as to stand a better chance of winning than those who bet with him, and the publication in any manner whatever of those odds for the purpose of getting bets. (Stormmouth's Dictionary; Century Dictionary; Standard Dictionary; Nelson's Ency.; Ency. Brittanica [9th ed.]; *Rex v. Corrie, Watson's* J. P. 294.) If the spirit of the constitutional provision against race course gambling and the purpose of the legislature in its re-enactment of section 351 of the Penal Code be given effect it must follow that the term " bookmaking " is used in a generic sense as including, broadly, all acts of gambling that have been heretofore incident to so-called bookmaking. (Const. of N. Y. art. 1, § 9.)

*Joseph S. Auerbach, John B. Stanchfield* and *Charles H. Tuttle* for respondent. The claim of the district attorney that section 351 of the Penal Code renders criminal the mere act of betting is an attempt to obtain, by judicial decision, legislation which the legislature when passing the Hart-Agnew Law expressly rejected. (*People v. Stedeker,* 175 N. Y. 57; *Johnson v. S. P. Co.,* 196 U. S. 1; *T. H. Dept. v. Maeschen,* 179 N. Y. 325; *State v. Kelly,* 81 Pac. Rep. 450.) The criminal statutes of this state as to wagers remain as they were before the passage of the so-called Hart-Agnew bills—chapters 506 and 507 of the Laws of 1908—except that the provisions for an exclusive penalty for the recording of bets upon certain race courses have been repealed. The only effect of the new laws is to apply a uniform penalty to the recording and registry of bets wherever made. (*People ex rel. Collins v. McLaughlin,* 128 App. Div. 599.) At common law betting was a matter of right, and a wager was a lawful and enforceable contract; and in New York this right has been curtailed in so far and only in so far as the statutes of the state expressly prohibit and punish it. No statute of this state—except in the case of bets upon prize fights

—has ever made a crime of mere betting between individuals, or of the mere offering to bet at odds or even chances, whether in the form of a single or of several bets or offers to bet, though in certain cases such betting has been made subject to pecuniary mulcts. As appears from a mere inspection of the criminal statutes of this State concerning gaming, sections 336 to 352 of the Penal Code, they are directed against the maintenance of houses or places set apart for the purpose of gambling and the paraphernalia with which it is conducted, and do not seek to punish by imprisonment mere betting or offering to bet, regardless of the frequency of such offers or of the ratio proposed. (*People v. Stedeker,* 175 N. Y. 57; *People ex rel, Collins v. McLaughlin,* 128 App. Div. 599; *People v. Todd,* 51 Hun, 446; *Lyman v. S. S. Club,* 39 App. Div. 459; *Powell v. K. P. R. C. Co.,* 66 L. J. N. S. [Q. B. Div.] 601; *Morgan v. Groff,* 4 Barb. 524; *Bunn v. Riker,* 4 Johns. 525; *Campbell v. Richardson,* 10 Johns. 406; *May v. Burras,* 13 Abb. [N. C.] 384; *Eggers v. Klussman,* 16 Abb. [N. C.] 226). The information fails to set forth facts which would constitute the crime of engaging in bookmaking. (*People ex rel. Sturgis v. Fallon,* 152 N. Y. 1). Without the making of some record there can be no bookmaking. (*Murphy v. Bd. of Police,* 11 Abb. [N. C.] 337; *State v. Oldham,* 200 Mo. 538; *People v. Bennett,* 113 Fed. Rep. 515; *Spies v. Rosenstock,* 87 Md. 14).

HAIGHT, J.:

The relator was arrested by virtue of a warrant, upon information filed by the district attorney with the Court of Special Sessions in the city of New York, in which information the relator was accused of the crime of engaging in bookmaking. The information charged that " The said Sol Lichtenstein, William Brown and Louis Mayer on the 23d day of September, 1908, at the Borough of Brooklyn, of the city of New York, in the county of Kings, on the grounds of a private inclosure known

as the race-course of the Brooklyn Jockey Club, a domestic corporation, where certain trials and contests of skill, speed and power of endurance of horses, commonly called horse-races, were then and there conducted, did unlawfully, willfully and knowingly, to many persons, upon the results of said races and upon various and divers horses that were announced to participate and did participate in said races, quote and lay odds, that is to say, did state and publish to said persons the terms on which they, said Sol Lichtenstein, William Brown and Louis Mayer, were willing then and there to bet with said persons on said results and against said horses; and did then and there quote and lay odds, as aforesaid, of eight to five on one of said horses called Fitz Herbert, and did then and there accept a bet of fifty dollars from a person whose name to the district attorney is unknown, but who can be identified, on said horse at said odds, that is to say, bet eighty dollars against fifty dollars bet by said person, that said horse would lose, against the form of the statute in such case made and provided." Thereupon relator petitioned for a writ of habeas corpus in which he claimed that the information filed stated no offense under section 351 of the Penal Code. Upon the hearing at Special Term the writ was sustained and the relator was discharged from custody.

Section 351 of the Penal Code, so far is now material, provides as follows: " Any person who engages in  .  .  . bookmaking at any time or place; or any person who keeps or occupies any room, shed, tenement, tent, booth, or building, float or vessel, or any part thereof, or who occupies any place or stand of any kind, upon any public or private grounds within this State, with books, papers, apparatus or paraphernalia, for the purpose of recording or registering bets or wagers,  .  .  . and any person who records or registers bets or wagers,  .  .  . upon the result of any trial or contest of skill, speed or power of endurance, of man or beast, or upon the result of any political nomination, appointment or election;  .  .  . is guilty

of a misdemeanor, and upon conviction is punishable by imprisonment in a penitentiary or county jail for a period of not more than one year."

Upon the argument of this appeal the learned district attorney stated that in the information by him, in which he charged the relator with laying odds and publishing the same to numerous persons, he did not intend to charge that such laying odds and publishing was by any writing or printed instrument, but that it was oral. We thus have the question presented as to whether a person who offers to bet, and so announces to others orally, upon a horse or horses that are about to engage in a race in which he lays odds, is a bookmaker within the meaning of the statute.

It will be observed that it is not alleged in the information, nor was it claimed upon the argument of this appeal, that the relator kept or occupied any room, shed, tenement, tent, booth, or building, float or vessel, or that he occupied any place or stand of any kind, upon any public or private grounds, with books, papers, apparatus or paraphernalia, for the purpose of recording or registering bets or wagers, nor is it alleged or pretended that he recorded or registered any bets or wagers. The provision relied upon by the district attorney is that he was engaged in bookmaking; that the laying of odds and orally announcing them constituted bookmaking within the meaning of the statute.

The term " bookmaking " originally indicated a collection of sheets of paper or other substances upon which entries could be made, either written or printed. But the term has been used in many ways, and in determining its meaning as used in this statute, we must consider the evident purpose and intention of the legislature in enacting the provisions in question, giving to the term its ordinary and accepted meaning as it was understood at that time.

For many years the racing of horses for the purpose of deter-
mining their skill, speed and power of endurance has been one
of the diversions in which a portion of the public has indulged,
and no county fair has been considered complete without a
race.    Generally, in large cities, associations have been or-
ganized which have constructed tracks and inclosed grounds for
that purpose, and annually have maintained races by the prom-
inent horses of the day.    Of late years, however, these associa-
tions have tolerated a system of bookmaking which has come
to be regarded as specially vicious and demoralizing to the pub-
lic.    The ordinary bookmaker is a person who follows the races
and becomes fully informed with reference to the skill, speed
and endurance of the horses that are entered for races.    These
horses are taken from one meeting to another of the various rac-
ing associations, and thereby the bookmakers are enabled to
prepare a list of the horses entered for a race, with the odds
so arranged as to percentages as to give them a profit whichever
the winning horse may be.    These schedules are written out and
either posted or circulated by the clerks or agents of the book-
maker among the persons in attendance upon the races and their
bets solicited, and when a customer is found he is given a check
indicating the horse and amount upon which he has placed his
money.    This was the scheme under which bookmakers were
enabled to induce men, women and persons of immature years
to part with their money, thus enabling the bookmaker to reap
great profits out of the public and to become the chief sup-
porters of the races.    This is the evil which the legislature
sought to prevent by the enactment of the Hart-Agnew bill,
chapters 506 and 507 of the Laws of 1908.    The making of the
lists and the laying of the odds so as to make the percentages
such as to give the bookmaker a profit has to be carefully figured,
the maker taking into consideration the speed and endurance of
the respective horses, and in order to make a practical use of
the list and secure bets it of necessity has to be entered upon

paper or some other material so that the odds upon each horse may be posted or shown to the patrons of the races when their bets are solicited.

It is perhaps true that a bookmaker may retain in his own mind the memory of the odds where three or four horses only are entered in a race so that he could state the odds orally to others, but it would be difficult for him or his customers to remember the precise amounts in many transactions and base their bets thereon, and consequently but very few bets could be taken under such circumstances. The masses could not be drawn into the scheme and their money obtained without some writing or entry that they could rely upon.

There has always been observed a distinction between betting and gambling, or the maintaining of a house or place to which people could resort to gamble. At common law wagers on different subjects were legal and might be enforced, while a gambling house or a resort for gamblers was a public nuisance. The same distinction obtains in this State where ordinary betting has never been made a crime, while the keeping of a gambling house has been subjected to severe punishment. (*People v. Stedeker*, 175 N. Y. 57-62). The laying of odds standing alone does not, therefore, constitute a crime. If a man should offer to bet the ladies of his party a pair of gloves to a box of candy, it would be the laying of odds and publishing the same. To hold him to be a bookmaker would, in my judgment, be a departure from the rule which gives to the terms of the statute their ordinary and accepted meaning, and would be a construction which was not within the contemplation of the legislature. The vice of bookmaking chiefly consists in soliciting and in the inducing the public to take chances in the carefully figured and planned scheme of the bookmaker, and this, in order to be profitable to him, requires the writing out of the list of the odds laid on some paper or material so that they can be seen by those who are solicited to invest.

We, consequently, conclude that the information filed by the district attorney failed to allege acts which constituted the crime of bookmaking, and that, therefore, the order appealed from should be affirmed.

CULLEN, Ch. J.:

I concur in the opinion of HAIGHT, J., for affirmance of the order appealed from.  Doubtless, the legislature, by the enactments before us, intended to suppress public gambling on race tracks and elsewhere.  It is also true that in the judgment of at least part of the community all betting or gambling is wrong. Legislation, however, should be practical, and it is at least doubtful whether a statute making every offer or acceptance of a bet or wager a crime could, in the present state of the morals and habits of the community, be enforced.  A general failure to enforce such a statute would bring the law into contempt and probably end in suffering all gambling to go unchecked.  It might also be hard to differentiate between public and private gambling.  For that reason, while the statute makes all bets and wagers illegal and void and money lost thereon recoverable, it has made gambling a crime only where it is accompanied by record, registry or the use of some part of the paraphernalia of professional gamblers, except in the case of pool-selling, where probably no writing or record is necessary to constitute the crime.  While in reality the statute is directed against gambling, not against its incidents, the law has laid hold of certain incidents on the theory that those being prohibited the evil itself will be suppressed because of the impracticability of carrying on gambling on a large scale without some of the accessories denounced by the statute.  How far this plan has proved successful in operation is for the legislature, not the courts, to determine, and we cannot hold that the act of the relator constitutes a crime unless it falls within the terms of the statute.  I think plainly it does not.  It is urged by the learned district

attorney that " bookmaking is really the arrangement of odds by which the bettor who arranges the odds seeks to do so in such a way as to stand a better chance of winning than those who bet with him, and the publication, in any manner whatever, of those odds for the purpose of getting bets." I cannot see that this definition of bookmaking affords any tangible distinction between that form of betting and other wagers. It may be assumed that any one offering a wager of a substantial sum believes that he has a better chance of winning than those who bet with him, and when he offers to wager, he undoubtedly publishes the offer. It has been also suggested that bookmakers arrange the odds they offer to bet on various horses so that, assuming all their wagers are accepted, there will result a substantial profit to them. Doubtless this is true, otherwise there would be no motive for their adopting the vocation of professional gamblers. But I have no idea that either the constitutional provision or the statutory enactment was directed against bookmaking for that reason. It was not intended to secure to persons who chose to bet with professional gamblers an even chance, but to prevent public gambling itself and the injury resulting therefrom to public morals. As already said, whether the plan adopted to suppress the evil is an efficacious one or not is solely for the legislature.

VANN, J. (dissenting) :

The crime of " engaging in bookmaking," as set forth in the statute and charged in the information before us, means engaging in public gambling as a business, according to a particular method. The method is to publicly quote and lay odds to all comers on the result of an uncertain event, such as a horse race about to take place, on the basis of a plan so furtivelyarranged as to enable one party to win as a rule, and to cause the other parties to lose as a rule. This is the substance of the crime, which may or may not be accompanied with the making of a

8

record of the transaction. The record, if made, is merely evidence of the odds quoted and the bets laid, so as to aid the memory. It is but an incident, such as maintaining a tent or booth, or making use of some other convenient agency to accomplish the result intended. While the crime can be committed with greater profit and more frequently by the use of a book, this does not make a written memorandum a part of the crime of bookmaking any more than it is a part of the crime of poolselling. Private betting and bookmaking are widely separated both in nature and effect, and the evil, if any, resulting from the one is trifling, while the evil resulting from the other is serious. As is well said in the prevailing opinion: " The vice of bookmaking consists chiefly in the soliciting and in the inducing the public to take chances in the carefully figured and planned scheme of the bookmaker . . ."

The Constitution forbids bookmaking, without defining it, except by the association of words as a form of gambling, and the statute forbids engaging in bookmaking also without defining it, but making it a distinct and independent offense. A disjunctive conjunction separates the first clause of section 351 of the Penal Code from those that follow and its function is to unite all the clauses grammatically, but to separate them in meaning and application. The effect, so far as the offense of " engaging in bookmaking " is concerned, is the same as if there was nothing in the section except the first clause and the closing words, which pronounce the offender guilty of a misdemeanor and provide the punishment to be inflicted. ·

In view of the explicit command of the Constitution and the history of legislation upon the subject, as well as the origin of the word " bookmaking " and its meaning in the country from which we borrowed it, I think the statute prohibits engaging in bookmaking with or without the aid of any writing, because writing is not of the substance and need not be resorted to, and hence, if resorted to, is a mere incident. Engaging in the busi-

ness of public gambling by quoting and laying insidious odds to a multitude of people was the evil aimed at, not making of a record of the business which is comparatively innocent.   I vote to reverse because, *me judice,* the information sets forth a criminal offense.

WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur with HAIGHT, J., and CULLEN, Ch. J.; VANN, J., reads dissenting opinion; EDWARD T. BARTLETT, J., not sitting.

Order affirmed.