## People of State of Illinois, Defendant in Error, v. Frank Lloyd, Plaintiff in Error.

### Gen. No. 10,758.

Opinion filed August 23, 1954. Released for publication September 10, 1954.

MYER H. GLADSTONE, of Chicago, and EDWARD A. JONES, of Dixon, for plaintiff in error.

JAMES E. BALES, State's Attorney, of Dixon, for defendant in error.

MR. JUSTICE DOVE delivered the opinion of the court.

Patricia Ann Wilson, on September 15, 1953, was an employee of the William G. Burns Detective Agency and by that agency assigned to investigate possible bookmaking operations in Lee county, Illinois. On September 21, 1953, Miss Wilson arrived in Dixon and subsequently went to Peter Piper's Cocktail Lounge and there became acquainted with Ed Piper. Mr. Piper introduced her to a man by the name of Tony who, on September 27, 1953, introduced her to the defendant in this proceeding, Frank Lloyd. The following afternoon Miss Wilson and Lloyd were together and had a few drinks, and that evening Miss Wilson met Lloyd again at Piper's Cocktail Lounge in Dixon where Lloyd introduced her to some of his friends and they, with Lloyd and Miss Wilson, drove to Sterling, returning to Dixon about two o'clock, a. m., on September 29, 1953. On the evening of October 2, 1953, Detective Hartsell, also of the Burns Agency, met Miss Wilson, gave her a $20 bill, asked her to memorize the serial number, and arranged with her to deliver it to Lloyd that evening. About seven o'clock that evening Miss Wilson phoned Lloyd to meet her at Peter Piper's Cocktail Lounge. She arrived there about nine o'clock. Another investigator of the Burns Agency, Luke P. Colleran, accom-

257a

panied by Henry Mortensen, a special deputy sheriff of Lee county, arrived at the Piper Tavern about thirty minutes after Miss Wilson's arrival. Lloyd came in Piper's Lounge fifty minutes later, and he was accompanied by a man and a woman. Miss Wilson was seated at the west end of a long booth on the north side of the tavern, and Lloyd came over to the booth where she was seated.

Upon the trial of this case, Miss Wilson testified to the foregoing and was then asked by the assistant state's attorney: "Did Frank Lloyd have a conversation with you?" and the witness answered: "He said 'Good evening,' introduced the people, sat down on my left and asked me what horse I had. I handed him the piece of paper I had in my purse and the $20 bill. The race and horse were written on the paper. He examined it, folded it up and put it in his inside left hand pocket." The paper which witness handed Lloyd was a letterhead of the Natchusa Hotel in Dixon upon which was written "7th Race Golden Trend Sat."

Miss Wilson further testified that "Golden Trend" was a horse which was running at Hawthorne, located at Cicero, Illinois. Within a few minutes after Lloyd had received this paper and money from Miss Wilson, Colleran and Mortensen came over to the booth where they were seated. Lloyd was placed under arrest, and Mortensen asked Lloyd for the paper and money which he had just received from Miss Wilson and he gave them to the officer, and upon the trial of this case they were offered and admitted in evidence.

On October 5, 1953, the state's attorney of Lee county filed in the county court of that county an Information by which he informed the court that on October 2, 1953, the said Frank Lloyd "at and within the County of Lee and State of Illinois as aforesaid, did wilfully and wrongfully keep a certain book and instrument

257b

known as a book within the City of Dixon, County of Lee and State of Illinois, said book then and there being kept for the purpose of registering bets and wagers upon the result and test of speed of a beast, to-wit, a horse, and did receive and accept from one Patty Wilson the sum of $20.00 as a wager upon the result and test of speed of a beast, to-wit, a horse, contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the same People of the State of Illinois."

To this Information the defendant entered a plea of not guilty; a trial was had, and the jury returned its verdict finding "the defendant guilty of book-making in manner and form as charged in the Information" and fixed his punishment at imprisonment in the county jail of Lee county for a term of 120 days and imposing a fine of $2,000. Upon this verdict an appropriate judgment was rendered after the court had denied defendant's motions in arrest of judgment and for a new trial. To reverse this judgment the defendant, Frank Lloyd, brings the record to this court for review by a writ or error.

Counsel for plaintiff in error insists that the statute under which plaintiff in error was convicted was intended to reach the professional gambler who keeps a book for registering bets and wagers on horse races; that the book is his equipment and stock in trade in the pursuit of his business and that if one registers a single bet on a piece of paper and there is no repetition of such an entry or registration, one cannot be said to be a bookmaker within the provisions of the statute. Counsel for the People contend that the taking of a single bet, with a record of the name of the horse and the track, the date of the race and amount bet, constitutes the offense of bookmaking within the meaning of our statute; that the evidence shows that plaintiff in error recorded or registered a $20 bet on behalf of

257c

Miss Wilson on a horse named "Golden Trend" which was running on Saturday, October 3, 1953, at the race track at Hawthorne, Cicero, Illinois, and that, therefore, the jury were warranted in returning the verdict it did and that the court properly rendered judgment on that verdict.

Plaintiff in error did not testify and offered no evidence in his own behalf. The substance of the testimony of Miss Wilson has been heretofore set out. The other witnesses who testified were Charles H. Redebaugh, acting postmaster of Dixon and former sheriff, who testified that while he was sheriff he had received complaints about bookmaking and that he employed the Burns Detective Agency to assist him in making an investigation and that Miss Wilson of that agency reported to him and on September 30, 1953, his duties ended as sheriff and he was succeeded by John Stouffer.

John Stouffer testified that he succeeded Charles H. Redebaugh as sheriff of Lee county; that Henry Mortensen was his deputy and at his direction Mortensen assisted Luke P. Colleran of the Burns Detective Agency in its investigation of bookmaking in Lee county. This witness also testified that following the arrest of plaintiff in error he was taken to the jail and searched and upon his person was $3,035.91, which was subsequently returned to him when he gave bond for his appearance. Henry Mortensen and Luke P. Colleran were the only other witnesses who testified on behalf of the People. These gentlemen testified that they were not acquainted with plaintiff in error, and the first time Mortensen had even seen him was on October 2, 1953, at Piper's Cocktail Lounge. Both testified that they arrived at the tavern after Miss Wilson but before Lloyd came in. They corroborated Miss Wilson's testimony as to the arrival of plaintiff in error at the tavern accompanied by a lady and a gentleman; that upon his arrival, Lloyd and his com-

257d

panions walked over to the booth where Miss Wilson was seated; that these witnesses observed Miss Wilson take a piece of paper out of her purse and hand it to Lloyd who opened the paper, took a bill out of it, and then put the bill and paper in his pocket. A couple of minutes later Colleran and Mortensen went over to the table where Miss Wilson and Lloyd and his friends were seated and Mortensen made himself known to Lloyd and placed him under arrest and took him to the county jail.

The testimony of Miss Wilson is that there had been no conversations or discussions between her and plaintiff in error about this piece of paper or the $20 bill before plaintiff in error came into the tavern sometime after ten o'clock on the evening of October 2, 1953. What then occurred was that plaintiff in error asked Miss Wilson what horse she had and, without making any oral reply, she gave him a piece of paper on which was written the name of "Golden Trend," which the evidence shows was the name of a horse and that this horse was going to run in the 7th race, Saturday, at Hawthorne. With this information, Miss Wilson gave to plaintiff in error a $20 bill which he accepted. The evidence is further that immediately after the arrest of plaintiff in error he was searched, and all the property found on his person was money in a billfold, a tie clip, a watch, and a couple of pieces of paper. What, if anything, was on these pieces of paper does not appear from the evidence.

The Act upon which this Information is based is entitled "An Act to Prohibit Book-making and Pool-selling." The Act consists of one section and is designated as section 336 of our Criminal Code [Ill. Rev. Stats. 1953, ch. 38, § 336; Jones Ill. Stats. Ann. 37.266]. It is as follows:

"That any person who keeps any room, shed, tenement, tent, booth, or building, or any part thereof, or who

257e

occupies any place upon any public or private grounds within this state, with any book, instrument or device for the purpose of recording or registering bets or wagers, or of selling pools, or any person who records or registers bets or wagers, or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, or upon the result of any political nomination, appointment or election, or being the owner, lessee or occupant of any room, shed, tenement, tent, booth, or building, or part thereof, knowingly permits the same to be used or occupied for any of these purposes, or therein keeps, exhibits or employs any device or apparatus for the purpose of recording or registering such bets or wagers, or selling of such pools, or becomes the custodian or depository for hire or privilege, of any money, property, or thing of value staked, wagered or pledged upon any such result, shall be punishable by imprisonment in the county jail for a period not longer than one year, or by fine not exceeding $2,000 or both. Provided, however, that the provisions of this act shall not apply to the actual enclosure of fair or race track associations that are incorporated under the laws of this state, during the actual time of the meetings of said associations, or within twenty four hours before any such meetings."

This statute, as applicable to this case, prohibits bookmaking and provides a penalty for recording or registering bets or wagers upon the result of a horse race. The Information to which defendant pleaded not guilty charged first that defendant kept a certain book for registering bets and wagers upon the result of a horse race and, second, that he received and accepted from Patty Wilson $20 upon the result of a horse race. The jury, by its verdict, found defendant guilty of bookmaking as charged in the Information.

In *State v. Morano,* 134 N. J. L. 295, 47 A.2d 419, the court said that the words "making a book" and "book-

257f

making" as used in an indictment require no explanation or definition as they mean the making of a betting book; that "bookmaking" means the making or taking and recording or registering of bets or wagers on races and kindred contests. *People v. Semmler,* 345 Ill. 272, 178 N. E. 100, was a prosecution under our Criminal Code. The court quoted the definition of a book, as used in gaming from Webster's International Dictionary, as a record of bets, especially a record of bets on horse races, and stated that "the statute contemplates a book or device for the purpose of betting on contests of the character specified." In *State v. Oldham,* 200 Mo. 538, 98 S. W. 497, the court held that a blackboard containing the names of the entries in a horse race and the odds was not a book under the gaming laws of that State. The word "book" in the vernacular of the racetrack, said the court, need not be a bound volume with printed matter therein; yet, to make a book, as that term is understood by the gambling fraternity, there must be a sheet of paper on which is recorded the name of the horse, the odds to be given, and either the name of the bettor or a numbered card by which the holder of the card could be designated and the name of the bettor printed on a card or ticket, and the amount which the bookmaker bet against the same. The author of the annotation in 153 A. L. R. 464 states that a "bookie" or "bookmaker" is a person who makes a business of betting on the result of horse races and other events. He is so called because of the original practice of such a person to enter wagers in a book or otherwise "keep books." A "poolroom" is a room or establishment conducted by a bookmaker, bookie, or person making a business of accepting wagers on the results of sporting contests, games, and other events. It was originally given such name because of the practice of the proprietors of such an establishment to conduct a pool on the results of such

257g

events wherein the bets were consolidated in a pool which was divided among those betting on the winner, the proprietor first receiving a commission of the total wagered for operating the pool.

24 Am. Jur. 414 (Gaming and Prize Contests, sec. 23) states that "bookmaking" and "pool-selling" constitute gaming or gambling which the state may prohibit or may regulate and control. "Bookmaking and pool-selling," continues this article (sec. 24, pp. 414, 415) "occur where bets on the results of horse races or other events are recorded and tickets sold showing the purchaser's proportion of the money won on such races or events. The vice of bookmaking chiefly consists of soliciting and in inducing the public to take chances in the carefully figured and planned scheme of the bookmaker, and this, in order to be profitable to him, requires the writing out of the list of the odds laid on some paper or material so that they can be seen by those who are solicited to invest. Hence, the cases are in accord that in order to constitute the offense of bookmaking, it is essential that there be some method of recording bets, and that without writing or recording there can be no bookmaking."

In 38 C. J. S. 147 (article on Gaming, sec. 85, E), it is said that poolselling and bookmaking were not common-law offenses; that to constitute the statutory crime of bookmaking it has been held that there be a record or registry of a bet and that the record or registry be made by defendant or by someone in his behalf. This article states that statutes regulating or prohibiting bookmaking and poolselling have been passed in many jurisdictions. "These statutes," continues this article, "have been held not to render ordinary or private betting an offense. It is still necessary, in order to make out the crime of bookmaking, that the defendant be a common or professional gambler or gamester who transacts business on the scheme or plan known as bookmaking, which is attended with such incidents

257h

as the public quoting and offering odds and the soliciting of bets from the public."

It appeared in *People ex rel. Lichtenstein v. Langan,* 196 N. Y. 260, 89 N. E. 921, 25 L. R. A. (N. S.) 479, that relator had been arrested upon an Information charging him with the crime of engaging in bookmaking. The statute under which he was prosecuted provided that any person who records or registers bets or wagers upon the result of any trial or contest of skill, speed, or power of endurance of man or beast, or engages in bookmaking at any time or place, is guilty of a misdemeanor. In the course of its opinion, the New York Court of Appeals said that the provision of the statute relied upon by the district attorney was the charge that defendant was engaged in bookmaking; that the laying of odds and orally announcing them on various horses participating in divers races constituted bookmaking within the meaning of the statute. In holding otherwise, the court said that the ordinary bookmaker was a person who followed the races and became fully informed with reference to the skill, speed, and endurance of the horses that are entered for races; that these horses are taken from one meeting to another of the various racing associations, and thereby the bookmakers were enabled to prepare a list of the horses entered for a race with the odds so arranged as to percentages as to give them a profit whichever the winning horse may be. These schedules are written out and either posted or circulated by the clerks or agents of the bookmaker among persons, and when a customer is found he is given a check indicating the horse and amount upon which he has placed his money. "This was the scheme," continued the court, "under which bookmakers were enabled to induce men, women and persons of immature years to part with their money, thus enabling the bookmakers to reap great profits out of the public and to become the chief supporters of the races. This is the evil which the legis-

lature sought to prevent by the enactment of the Hart-Agnew bill. The making of the lists and the laying of the odds so as to make the percentages such as to give the bookmaker a profit has to be carefully figured, the maker taking into consideration the speed and endurance of the respective horses, and in order to make a practical use of the list and secure bets, it, of necessity, has to be entered upon paper or some other material so that the odds upon each horse may be posted or shown to the patrons of the races when their bets are solicited." The court then said that the laying of odds, standing alone, does not constitute a crime and then continued: "The vice of bookmaking chiefly consists in soliciting and in the inducing the public to take chances in the carefully figured and planned scheme of the bookmaker, and this, in order to be profitable to him, requires the writing out of the list of the odds laid on some paper or material so that they can be seen by those who are solicited to invest."

In a later case, *People v. Lambrix*, 204 N. Y. 261, 97 N. E. 524, the defendant was convicted under an indictment based upon the same statute, as amended, upon which the Information in the *Lichtenstein* case was drawn. The indictment in the *Lambrix* case charged the defendant with the crime of receiving, recording and registering bets and wagers upon the result of a horse race. The court of appeals reviewed the case and in its opinion said that the evidence showed that defendant did make bets with certain persons on a horse race but that there was no evidence to show that he recorded or registered a bet in any other way than by receiving a memorandum made by the party with whom he bet. In its opinion the court referred to *People ex rel. Lichtenstein v. Langan*, 196 N. Y. 260, 89 N. E. 921, 25 L. R. A. (N. S.) 479, supra, and stated that the court had held in that case that making a bet or wager, unaccompanied with a record or registry, was not a crime. The court then stated that

257j

since the *Lichtenstein* case was decided the legislature had amended the statute so as to make it a crime to engage in poolselling or bookmaking with or without writing but had not changed the law as to recording and registering bets. The court went on to say that the question for determination by the court in the *Lambrix* case arising after the legislature had amended the statute, was whether the receipt by the opposite party of a memorandum of the wager was a registry or record by the defendant. In answering this question in the negative, the court said: "To bring the case within the statute, it was not necessary that the defendant personally should make the record or registry of the wager. If it was made by any person in his employ or on his behalf or by his direction, that would be sufficient to charge him. . . . If the mere receipt of the memorandum by the defendant was a registry by him, necessarily the receipt of a memorandum by any one who might make a bet with a pool-seller or a bookmaker would make him a criminal equally with the pool-seller or bookmaker. As appears from the discussion in the Lichtenstein case, supra, such was not the intent of the law. It was directed against public gambling and professional gamblers and, as was there said, while all gambling has for a long time been illegal in this state, professional gambling and the maintenance of gambling resorts alone have been subjected to the penalties of the criminal law."

██ The statute of our State provides punishment for anyone who keeps a book and records or registers bets or wagers on horse races. The instant Information charges that defendant did two things: first, kept a certain book for the purpose of registering bets and wagers upon the result of a horse race; and, second, that he received from Patty Wilson $20 as a wager upon a horse race. The evidence is that he did receive from Patty Wilson a $20 bill, the name of a race horse, and the place where, the date and number

257k

of the race this horse would race, but the record is devoid of any evidence that plaintiff in error kept any book, card, device, or anything else for the purpose of registering bets or wagers. The authorities hold that bookmaking occurs when bets are recorded; that in order to constitute the offense there must be some method of recording bets, and without recording there can be no bookmaking; that such recording or registry must be made by defendant or someone in his behalf; that odds must be stated in order to make out an offense, the defendant must transact business on a scheme or plan attendant with some of the incidents recognized as essential to the business conducted by a bookie or bookmaker. In the instant case there is no evidence that plaintiff in error ever kept any book for any purpose or ever entered any notation of any kind on any piece of paper or on anything else. There is no evidence that plaintiff in error ever accepted money from any person other than Miss Wilson for any purpose. If by retaining this $20 bill, which Miss Wilson handed plaintiff in error, it can be said that plaintiff in error accepted a bet, it does not follow that he is guilty of bookmaking contrary to the provisions of section 336 of the Criminal Code, as charged in the Information. In the *Lambrix* case, *supra,* the court held that the receipt of a memorandum by the defendant was not a recording or registry by him of a bet. So, in the instant case, the receipt of the memorandum which plaintiff in error accepted from Miss Wilson cannot be held to be a recording or registry of a bet by plaintiff in error under the provision of our statute.

In our opinion, the verdict is not sustained by the evidence and the trial court erred in rendering judgment thereon. That judgment is, therefore, reversed.

*Judgment reversed.*

WOLFE, J., concurs.

ANDERSON, J., took no part.