THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT F. DUGAN, *et al*, Defendants-Appellants.

Second District Nos. 2—83—0444, 2—83—0452, 2—83—0503 cons.

Opinion filed July 19, 1984.

---

NASH, J., dissenting.

Benedict J. Ori, of Ori, Tepper & Fox, of Waukegan, and Patrick A. Tuite, of Chicago, for appellants.

Neil F. Hartigan, Attorney General, of Springfield, and Fred Foreman, State's Attorney, of Waukegan (David Bindi, Assistant Attorney General, and Phyllis J. Perko, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Following a bench trial in the circuit court of Lake County defendants were convicted of syndicated gambling (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(b)) in connection with the operation of a gambling casino at the Green Mill Restaurant near Grayslake. On appeal, they claim that: (1) the receipt of wagers for blackjack and craps is not "bookmaking" within the meaning of the statute; (2) the State failed to prove the required element of a "recording"; (3) the State failed to prove that defendants were engaged "in the business" of bookmaking; (4) the Illinois syndicated gambling statute is vague, uncertain and hence unconstitutional; (5) there was insufficient evidence to prove syndicated gambling and thus the forfeiture of an automobile based upon that offense must fall; and (6) the forfeiture order entered by the court is against the manifest weight of the evidence.

Defendants, Robert F. Dugan, Barbara J. Miller, Sharon L. Skelton, James R. Siegal, Peter R. Lambiris, Bill Anagnostara, Trina M. Brie, Norman P. Roberts, and Edward M. Kahn, were indicted on charges of syndicated gambling following a three-month undercover investigation by the Illinois Department of Law Enforcement (DLE). The investigation revealed that the basement of the restaurant housed a private club called the Northern Illinois Fin & Tail Feather Club in which games of blackjack and craps were played by patrons and conducted by defendants. Members of the club were identified by their possession of membership cards which could be obtained through sponsorship by other members. Access to the club was barred by a steel door with a locking mechanism. The lock was released by a buzzer operated by a doorman who was able to view the patrons through a peephole before allowing them in. Inside the club were two card tables for blackjack, a dice table, a horseshoe-shaped bar and several food tables. Behind this area was a hallway leading to restrooms, a pay telephone, and a wine cellar which housed a large metal safe. On September 10, 1982, the date of the indictment, a number of patrons were in the club.

Patrons of the club purchased poker chips from dealers at the tables and used the chips to bet at the various games. Additionally, patrons who had dinner at the Green Mill Restaurant above the casino

could exchange the receipt from the dinner check for chips. In this way, defendants would pay for the patrons' dinners. The chips came in various colors corresponding to different dollar amounts. Underneath one of the blackjack tables was a cash box. When chips were purchased at any of the gambling tables, the cash was deposited into the cash box through a slot in the blackjack table. Defendant Roberts approved each sale of chips by nodding his head at the dealers, after which the chips were dispensed. Periodically, defendant Roberts would remove the cash from the cash box and walk it down the hall towards the wine cellar, sometimes accompanied by defendant Dugan. These defendants, along with the remaining defendants, also dealt the games and took money in exchange for chips. Defendants Dugan, Roberts and Kahn all collected gambling debts from the patrons in addition to their other duties.

The club provided food, drinks, and cigarettes to its patrons free of charge. The employees of the club worked for tips in the form of poker chips. The chips were cashed in at the end of the evening, as were the patrons' chips, by defendants Dugan, Roberts and Kahn.

The testimony at trial established that these operations had been going on at least since March 1982, when the club was raided by deputies of the Lake County Sheriff's office. Despite the raid, gambling continued during the succeeding months. On September 10, 1982, the date specified in the indictment, six DLE agents spent varying amounts of money in the casino, ranging from $100 to $2,200.

Defendants presented no evidence in defense of the syndicated gambling charge, and were subsequently found guilty of the offense. Defendants' post-trial motions to dismiss the indictments and for a new trial were denied. They were sentenced to various terms of supervised probation and imprisonment, and were ordered to pay restitution and fines. Defendants appeal from their convictions.

In a separate action, the Lake County State's Attorney filed a civil complaint for the forfeiture of one 1977 Cadillac Coupe DeVille, which was seized from the parking lot of the Green Mill Restaurant on the evening of the raid. At the hearing on the complaint, State Trooper David Conrod testified that during the raid he identified all vehicles parked in the lot behind the restaurant. Using a flashlight, he observed several decks of cards and a number of Northern Illinois Fin & Tail Feather Club membership cards inside the vehicle in question. He advised the supervising assistant Attorney General of this finding and was instructed to have the car confiscated and towed away for evidence. Following this seizure a search warrant was obtained. Recovered in the subsequent search were numerous membership cards,

poker chips, playing cards, gambling table covers, and $30,000 in cash. It was also discovered that this cash included $700 of the money gambled by several of the DLE agents. DLE agent Paul Olsen testified that during his interview of defendant Dugan following his arrest, Dugan stated that he was the owner of the Cadillac.

The defendant presented testimony in the forfeiture action that the Cadillac in question was owned by one Sandra Martinez, although negotiations for its purchase were made by defendant Dugan. Dugan also paid the dealer over $5,000 on August 10, 1982, for the vehicle. Nine days later defendant Dugan returned the vehicle so that certain repairs could be made. Sandra Martinez received the title for the automobile, purchased insurance for the car, but allowed Dugan to borrow the vehicle for an indeterminate period of time. Defendant Dugan kept the car from August 31, 1982, until the raid on September 10-11, 1982. Martinez was unemployed at the time of the purchase and had not earned over $10,000 a year for the two years preceding the raid. She had no bank account, and testified that the $5,000 used to pay for the vehicle came from cash which she kept in her home.

The trial court found that defendant Dugan was the *de facto* owner of the automobile, and ordered the vehicle forfeited. Appeal is also taken from the forfeiture order.

We first consider defendants' argument that the receipt of wagers on blackjack and craps is not "bookmaking" within the meaning of section 28—1.1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(b)), but rather is the lesser offense of "gambling," as set forth in section 28—1(a)(1) of the Criminal Code (Ill. Rev. Stat. 1981, ch. 38, par. 28—1(a)(1)). Noting that the bookmaking statute has never been applied in a case dealing with the playing of cards and dice for money, defendants maintain that the legislature intended to make "gambling" and "bookmaking" two separate offenses, each proscribing different conduct. Specifically, defendants argue that the offense of "bookmaking" occurs only where wagers are taken from others on events or contests in which neither the bookie nor the bettor is a participant. (See *People v. Petrus* (1981), 98 Ill. App. 3d 514, 424 N.E.2d 755; *People v. Smith* (1979), 69 Ill. App. 3d 752, 387 N.E.2d 1084; *People v. Finn* (1978), 68 Ill. App. 3d 126, 385 N.E.2d 103; *People v. Greenman* (1976), 38 Ill. App. 3d 734, 348 N.E.2d 465; *People v. Stavros* (1974), 18 Ill. App. 3d 1071, 311 N.E. 2d 220; *People v. Lloyd* (1954), 3 Ill. App. 2d 257, 121 N.E.2d 329.) The State contends, on the other hand, that the offenses of "gambling" and "bookmaking" are not mutually exclusive, but rather differ only in the extent and degree of the conduct proscribed.

Section 28—1.1(b) of the Criminal Code of 1961 states that "[a] person commits syndicated gambling when he operates a 'policy game' or *engages in the business of bookmaking.*" (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(b).) The offense is a Class 3 felony. (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(f).) "Bookmaking" is defined in the statute as follows:

"(d) A person engages in bookmaking when he receives or accepts more than five bets or wagers upon the result of any trials or contests of skill, speed or power of endurance or upon any lot, chance, casualty, unknown or contingent event whatsoever, which bets or wagers shall be of such size that the total of the amounts of money paid or promised to be paid to such bookmaker on account thereof shall exceed $2,000. Bookmaking is the receiving or accepting of such bets or wagers regardless of the form or manner in which the bookmaker records them."

(Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(d).)

"Gambling," on the other hand, is defined in pertinent part as follows:

"(a) A person commits gambling when he:

(1) Plays a game of chance or skill for money or other thing of value, unless excepted in subsection (b) of this Section; ***."

(Ill. Rev. Stat. 1981, ch. 38, par. 28—1(a)(1).)

The offense is a Class A misdemeanor (Ill. Rev. Stat. 1981, ch. 38, par. 28—1(c)). The list of exceptions set forth in subsection (b) of the gambling statute is not applicable here (Ill. Rev. Stat. 1981, ch. 38, par. 28—1(b)).

The cardinal rule of statutory construction is that the courts are to ascertain and give effect to the true intent and meaning of the legislature. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141, 445 N.E.2d 1174.) The specific words of a statute are the best indicators of the legislative intent behind the statute. (*Mack v. Seaman* (1983), 113 Ill. App. 3d 151, 155, 446 N.E.2d 1217.) Where the language of a statute is plain, there is no need for interpretation; however, where interpretation is required, the appellate court will select the construction which leads to a logical result, and will consider the object to be attained and the result of various interpretations of the act. (*Jones v. Municipal Officers Electoral Board* (1983), 112 Ill. App. 3d 926, 929, 446 N.E.2d 256.) Criminal or penal statutes are to be strictly construed in favor of an accused and nothing is to be taken by intendment or implication against him beyond the literal or obvious meaning of the statute. (*People v. Scribner* (1982), 108 Ill. App. 3d 1138, 1144, 440 N.E.2d 160.) Nevertheless, such statutes are not to be construed

so strictly as to defeat the obvious intent of the legislature. *People v. Scribner* (1982), 108 Ill. App. 3d 1138, 1144, 440 N.E.2d 160.

■ After reviewing the foregoing provisions, we reject defendants' argument that "gambling" and "bookmaking" are mutually exclusive offenses. First, the plain language of the bookmaking statute does not exclude the playing of games of chance for money from its provisions; nor does it limit its application to situations where the bookie and bettor are nonparticipants in the event wagered upon. It is a fundamental rule of statutory construction that a court cannot inject provisions not found in the statute, however desirable or beneficial they may be. *Droste v. Kerner* (1966), 34 Ill. 2d 495, 504, 217 N.E.2d 73, *appeal dismissed, cert. denied* (1967), 385 U.S. 456, 17 L. Ed. 2d 509, 87 S. Ct. 612.

■ ■ Second, the plain language of the bookmaking statute states that it is to apply to bets or wagers made "upon any lot, chance, casualty, unknown or contingent event whatsoever ***." (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(d).) A "lot" is commonly defined as "[a]n object used in making a determination or choice by chance." (American Heritage Dictionary 771 (1969).) Similarly, "chance" has been defined as "[t]he probability of occurrence of an event; *** an unexpected random, or unpredicted event." (American Heritage Dictionary 224 (1969).) While it is true that the conduct of playing cards and dice for money fits within the plain language of the gambling statute (Ill. Rev. Stat. 1981, ch. 38, par. 28—1(a)), it is also clear that a wager upon such games of chance is also prohibited by the plain language of the bookmaking statute. Further, the legislature has expressly declared that its intent in enacting the syndicated gambling statute was "to restrain persons from engaging in the business of *gambling* for a profit ***." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(a).) Where the legislature uses the same words in different parts of the statute, those words are generally given the same meaning. (*People v. Dunlap* (1982), 110 Ill. App. 3d 738, 742, 442 N.E.2d 1379.) Although a statement of policy is not a part of the Act it precedes (see *Hayen v. County of Ogle* (1983), 116 Ill. App. 3d 80, 84, 451 N.E.2d 612, *aff'd* (1984), 101 Ill. 2d 413, 463 N.E.2d 124), we nevertheless believe that the legislature's use of the word "gambling" in its declaration of policy indicates an intent to incorporate the gambling offenses as set forth in section 28—1 into the syndicated gambling statute. Thus, we find that the conduct of playing cards and dice for money may fall within the meaning of the syndicated gambling statute, provided that all the other elements of the offense are proved. Under these circumstances, it is within the State's Attorney's

discretion to choose which of several charges shall be brought against defendants. *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 539, 397 N.E.2d 809.

Defendants next contend that the bookmaking statute requires a recording of wagers, which the State failed to prove in the instant case. The State argues that the recording element was satisfied by the defendants' sale and cashing of color-coded poker chips to the patrons of the establishment, and the requirement that only chips be used for betting. For the reasons which follow, we reverse defendants' convictions.

■■ "Bookmaking," as defined in the syndicated gambling statute, occurs when one receives or accepts more than five bets totaling $2,000 or more *"regardless of the form or manner in which the bookmaker records them."* (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(d).) This definition of bookmaking changed the prior law, which stressed the written recordation and registering of bets and wagers as the gist of the offense. (See *People v. Lloyd* (1954), 3 Ill. App. 2d 257, 121 N.E.2d 329.) The language of the amended bookmaking statute represents a shift in emphasis from the recording element to the receipt and acceptance of the bets which form the basis of the bookmaking charge. Nevertheless, we do not believe the legislature intended to eliminate recording as an element altogether. Had it so intended, it could have eliminated the requirement by explicit language in the statute. (See, *e.g.*, Cal. Penal Code sec. 337a: "Every person who engages in poolselling or bookmaking, *with or without writing,* *** is punishable by imprisonment ***" (emphasis added).) We therefore conclude that rather than eliminating the recording requirement the legislature intended to expand the methods by which a recording could be made.

■■ Despite this expanded interpretation of a recording, it is our opinion that the sale and use of color-coded poker chips in the casino was insufficient to satisfy the recording requirement of the bookmaking statute. Although poker chips may have been used by defendants to determine the profits or losses of the casino on any given evening, we do not believe they memorialized the bets or wagers placed by a particular individual on a specified game of blackjack or craps. We conclude that the State failed to establish a recording of the bets or wagers beyond a reasonable doubt and that defendants' convictions must therefore be reversed.

Because we are reversing defendants' convictions for the reason stated above, we do not reach defendants' other arguments concerning their convictions. We will consider, however, the separate appeal

relating to the forfeiture of the automobile which was allegedly used in the commission of the crime of syndicated gambling.

It is first argued that the forfeiture order must fall because defendants were not proved to have committed syndicated gambling. We disagree.

 █ A forfeiture proceeding under section 36—1 of the Criminal Code of 1961 is a civil action *in rem* against an item used in the commission of a crime. (Ill. Rev. Stat. 1981, ch. 38, par. 36—1 *et seq.*; *People ex rel. Carey v. 1976 Chevrolet Van* (1979), 72 Ill. App. 3d 758, 760, 391 N.E.2d 137.) The legislative policy behind forfeiture statutes is that forfeiture of vehicles is permitted in order to repress certain types of crimes when these vehicles are used in their commission. (72 Ill. App. 3d 758, 760, 391 N.E.2d 137.) Under the statute, the forfeiture of such items is not dependent upon a prior conviction; the State need only prove its position that the vehicle was used in commission of an offense by a preponderance of the evidence, rather than beyond a reasonable doubt. (*People ex rel. Power v. One 1979 Chevrolet Camaro* (1981), 96 Ill. App. 3d 109, 112, 420 N.E.2d 770; *People ex rel. Hanrahan v. One 1965 Oldsmobile* (1972), 52 Ill. 2d 37, 41, 284 N.E.2d 646, *rev'd on other grounds sub nom. Robinson v. Hanrahan* (1972), 409 U.S. 38, 34 L. Ed. 2d 47, 93 S. Ct. 30.) The trial court in a civil proceeding does not examine the issue of a defendant's guilt or innocence. *People v. Fulton* (1979), 68 Ill. App. 3d 915, 925, 386 N.E.2d 605.

 In *People ex rel. Hanrahan v. One 1965 Oldsmobile* (1972), 52 Ill. 2d 37, 42, 284 N.E.2d 646, the Illinois Supreme Court expressly declined to consider the question whether a forfeiture would exist in a situation where a defendant was acquitted or not tried at all on the offense charged. We, too, decline to consider this question. Although we have found that defendants' convictions of syndicated gambling cannot stand, we do not believe our finding affects the validity of the forfeiture proceeding. The complaint for forfeiture here stated that defendant Dugan used the Cadillac in violation of section 28—1 of the Criminal Code of 1961, which is the gambling rather than the syndicated gambling statute (Ill. Rev. Stat. 1981, ch. 38, par. 28—1). The offense of gambling was clearly established by a preponderance of the evidence, and defendants on appeal have essentially conceded that that offense was in fact committed. Since a forfeiture order is not dependent upon a prior conviction (*People ex rel. Power v. One 1979 Chevrolet Camaro* (1981), 96 Ill. App. 3d 109, 112, 420 N.E.2d 770), the forfeiture order in the present case is not invalid because the offense of syndicated gambling was not proved beyond a reason-

able doubt.

Finally, it is argued that the forfeiture order is against the manifest weight of the evidence in two respects. First, it is claimed that the title holder of the automobile, Sandra Martinez, must have had knowledge that defendant Dugan was involved in a gambling operation before a forfeiture order may issue. Second, defendant argues that the vehicle was not used to facilitate the commission of a crime. The State argues that the appropriate inquiry is whether the vehicle was used with the knowledge and consent of the "true owner," and that ownership may reside in someone other than the title holder. The State also argues that the presence of gambling paraphernalia in the automobile is sufficient to establish by a preponderance of the evidence that it was used to facilitate the gambling operation.

■■ Section 36—1 of the Criminal Code of 1961 authorizes the seizure of any vehicle "used with the knowledge and consent *of the owner* in the commission of, or in the attempt to commit *** an offense prohibited by *** 28—1 of this Code ***." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 36—1.) Upon seizure, the sheriff must give notice of the seizure to "each such person whose right, title or interest is of record ***." (Ill. Rev. Stat. 1981, ch. 38, par. 36—1.) In the forfeiture proceeding which follows, the State's Attorney may cause the remission of the forfeiture if he finds "that such forfeiture was incurred without willful negligence or without any intention *on the part of the owner* of the *** vehicle *** or *any person whose right, title or interest is of record *** to violate the law." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 38, par. 36—2(a).) We believe the legislature's use of the terms "owner" and "person whose right, title or interest is of record," used through section 36—2, indicates its awareness that ownership and title may not necessarily reside in the same person.

■■ ■ Given this recognition of the difference between these two terms, we conclude that it is the knowledge and consent of the "owner," and not the title holder, which is paramount in determining whether a particular vehicle is subject to forfeiture. (Ill. Rev. Stat. 1981, ch. 38, par. 36—1, *et seq.*) The word "owner" may be used to describe one who has dominion or control over a thing, the title to which is in another. (Black's Law Dictionary 1259 (4th ed. 1968).) In the instant case, it is undisputed that defendant Dugan exercised dominion and control over the vehicle in question, and this fact is amply supported by the record. Further, the trial court specifically found incredible certain defense testimony indicating that the car was purchased with money saved by Ms. Martinez. Under these circum-

stances, the trial court's finding that defendant Dugan was the true owner of the vehicle is not against the manifest weight of the evidence. Thus, his knowledge and consent of the use of the vehicle in the commission of a crime is sufficient to subject the vehicle to forfeiture.

The cases cited by defendant in support of its position are distinguishable from the present case. In *1957 Chevrolet v. Division of Narcotic Control* (1963), 27 Ill. 2d 429, 189 N.E.2d 347, a case factually similar to the case at bar, there was no specific issue as to "ownership" of the vehicle in question. Additionally, at the time of the *1957 Chevrolet* case there was no distinction made in the challenged statute between "owner" and "title holder." Thus, the case is of little guidance here.

In another case cited by defendant, *People ex rel. Carey v. 1976 Chevrolet Van* (1979), 72 Ill. App. 3d 758, 391 N.E.2d 137, the vehicle which was the subject of a forfeiture action was dominated and controlled by the same person who held title. Thus, that case is also inapposite. Similarly, the case of *People v. One 1978 Mazda GLC Hatchback Automobile* (1983), 115 Ill. App. 3d 187, 450 N.E.2d 339, is uninstructive since it stands only for the proposition that only one who has a recorded interest in a vehicle may contest its forfeiture. (115 Ill. App. 3d 187, 190, 450 N.E.2d 339.) Here, Ms. Martinez' standing to contest the forfeiture provision is not in issue.

Defendant also argues that the vehicle was, at best, merely a repository for money after the offense was committed and did not facilitate the commission of the offense. We disagree. The vehicle here contained large sums of money (*i.e.*, $30,000), $700 of which was money wagered by the undercover investigators, as well as membership cards to the club, poker chips, playing cards, and gambling table covers. It is reasonable to infer from the presence of gambling paraphernalia and membership cards in the automobile that the vehicle was used to promote the gambling operation. See *People ex rel. Stamos v. 1965 Chevrolet Chevy II* (1968), 99 Ill. App. 2d 201, 207, 240 N.E.2d 169.

For the foregoing reasons, the judgment of the circuit court of Lake County finding defendants guilty of syndicated gambling is reversed; the forfeiture order is affirmed.

Affirmed in part; reversed in part.

UNVERZAGT, J., concurs.

JUSTICE NASH, dissenting:

I respectfully dissent from that portion of the majority opinion in which it holds that a "recording" of wagers by defendant is an element of the offense of syndicated gambling when premised upon bookmaking (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(b)).

It is correct, as noted in the opinion, that the gist of the former offense of bookmaking was the keeping of a book, instrument, or device for the purpose of recording or registering bets or wagers (see Ill. Rev. Stat. 1959, ch. 38, par. 336), and, under that form of the statute, it was held that without a recording there could be no bookmaking. (*People v. Lloyd* (1954), 3 Ill. App. 2d 257, 257l.) That statute, and its explicit recording language, was repealed, however, on the enactment of the Criminal Code of 1961 and "bookmaking" now appears in the Criminal Code only as a part of the syndicated gambling statute. It is there redefined as follows:

> "(d) A person engages in bookmaking when he *receives* or *accepts* more than five bets or wagers upon the result of any trials or contests of skill, speed or power of endurance or upon any lot, chance, casualty, unknown or contingent event whatsoever, which bets or wages shall be of such size that the total of the amounts of money paid to such bookmaker on account thereof shall exceed $2,000. Bookmaking is the receiving or accepting of such bets or wagers regardless of the form or manner in which the bookmaker records them." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 28—1.1(d).)

As may be seen, bookmaking is no longer the keeping of a record of wagers, but is defined as occurring when one accepts multiple wagers aggregating over $2,000 upon the outcome of certain occurrences. The previous requirement that a book or record be kept in which wagers are recorded is not seen in the present statute and should not be inserted by this court after having been removed by the legislature. Perhaps to avoid that result, the legislature stipulated that bookmaking is the receiving or accepting of wagers "regardless of the form or manner in which the bookmaker records them." I do not consider that it was intended by this language that proof of a recording of wagers must be shown as an element of the offense of syndicated gambling.

I would affirm the judgment of the trial court.